**JP, a minor, by and through his parents and next friends, Karl PETERSON and Linda Peterson, Plaintiff,**

v.

**COUNTY SCHOOL BOARD OF HANOVER COUNTY, VIRGINIA, Defendant.**

**Civil Action No. 3:06cv28.**

United States District Court,
E.D. Virginia,
Richmond Division.

June 2, 2009.

Philip Carter Strother, Strother Law Offices PLC, Krista Mathis Samuels, Law Office of Krista M. Samuels, Richmond, VA, for Plaintiffs.

Yvonne Steenstra Wellford, Hanover, VA, Bradford Allen King, Harrell & Chambliss LLP, Richmond, VA, for Defendant.

## MEMORANDUM OPINION

ROBERT E. PAYNE, Senior District Judge.

This matter is before the Court on the Plaintiffs' Petition for Attorney Fees and Expenses Exclusive of Costs for Education at Dominion School for *JP I* and *JP III*

(Docket No. 113), the Plaintiffs' Petition for Attorney Fees and Expenses Associated with United States Court of Appeals for the Fourth Circuit, *JP II*, (Docket Number 111), and the Plaintiff's Statement of Costs of Educating JP at the Dominion School during the 2005–2006 School Year (Docket Number 110).

## BACKGROUND

JP's family moved to Virginia in late 2000, and JP began school as a first grader at Battlefield Park Elementary School in Hanover County in January 2001. JP was enrolled in the Hanover County Public Schools ("HCPS") special education program from January 2001 until May 7, 2003.

In May 2003, JP's parents removed him from HCPS and placed him in the Spiritos School ("Spiritos"), a private specialty school for children with autism, because his parents were concerned that JP was not making adequate progress at the public school. JP made significant gains at Spiritos during the following year, but JP's parents wanted him to succeed in the public school system and took steps to re-enroll him in HCPS for the 2004–2005 school year.

JP's parents brought a due process challenge against HCPS (the "2003 Dispute") based on their dissatisfaction with the education that JP received at Battlefield Park. This dispute was settled without a hearing, and resulted in both a monetary settlement and concessions from HCPS.

Thereafter, as provided by the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1415 *et seq.*, an individualized education plan ("IEP") team, including JP's parents, convened in the summer of 2004 to design an appropriate IEP for JP at HCPS. The product of those meetings was an IEP signed on August 17, 2004 ("2004 IEP") which placed JP in a special education program at the Rural Point Elementary School. Because of JP's success at Spiritos, the parents sought to obtain, and, in fact, were promised in the 2004 IEP, an educational program at Rural Point that would use many of the same educational methods used at Spiritos. Indeed, the 2004 IEP incorporated parts of the settlement of the 2003 Dispute.

JP began at Rural Point in September 2004 under the curriculum set forth in the 2004 IEP, but, throughout the school year, JP's parents had concerns about JP's progress. Despite various requests of the school to assess JP's progress and to adjust his curriculum, the parents ultimately came to the view that JP was actually regressing rather than progressing, and so informed HCPS. HCPS contended, to the contrary, that JP was making sufficient progress. By June 2005, JP's parents and HCPS had vastly different views on whether the 2004 IEP had provided JP with educational benefit and, when HCPS proposed an IEP for 2005–2006 ("2005 IEP") that was substantially the same as the 2004 IEP, JP's parents asked HCPS to provide JP with a private placement at public expense at a local specialty school such as Spiritos, where JP formerly had great success. HCPS refused that request, and JP's parents subsequently rejected the proposed IEP for the 2005–2006 school year.

Thereafter, the parents, pursuant to IDEA, filed a request with the State for a due process hearing to challenge the adequacy of the 2004 and 2005 IEPs before an impartial administrative hearing officer. The due process hearing was held on July 25, and September 29 and 30, 2005.[1] The

---

1. The delay between the sessions resulted because the parents changed counsel after the July 25 session.

State Hearing Officer held, in a written decision dated October 14, 2005, that JP had made more than minimal progress during the 2004–2005 school year, and that both the 2004 and 2005 IEPs were appropriate under the IDEA and governing law. The practical effect of that ruling was that JP's parents would not be entitled to reimbursement for enrolling JP in Dominion, and, if they re-enrolled JP at HCPS, could not expect an IEP that varied from the one they had rejected several months prior.

On January 11, 2005, pursuant to the IDEA, JP's parents filed a seven-count complaint in this Court seeking a review and reversal of the State Hearing Officer's ruling. Although the complaint contained seven counts, the parties agreed that each of the counts alleged in the complaint related solely to the question whether the June 2005 IEP satisfied the requirements of IDEA and the relevant decisional law, and whether the parents were entitled to reimbursement for the cost of educating JP at Dominion during the 2005–2006 school year. After extensive hearings and briefing, the Court concluded: that the 2005 IEP did not provide an appropriate education as required by the IDEA; that Dominion was an appropriate placement for JP; that HCPS must reimburse JP's parents for "the reasonable costs of educating JP at the Dominion School and any related services and accommodations that would have been covered under the IDEA had HCPS provided JP with an appropriate education during the 2005–2006 school year;" and that JP's parents were "entitled to reasonable attorney's fees as permitted by the IDEA and governing decisional law." *See JP ex rel. Peterson v. County Sch. Bd. of Hanover County, Va.,* 447 F.Supp.2d 553, 591 (E.D.Va.2006) (*hereinafter JP I* ).

On appeal, the United States Court of Appeals for the Fourth Circuit held that this Court had accorded insufficient deference to the decision of the State Hearing Officer, vacated the Court's decision, and remanded for reconsideration the merits of the case. *JP ex rel. Peterson v. County School Bd. of Hanover County, Va.,* 516 F.3d 254, 263 (4th Cir.2008)(*hereinafter JP II* ). The Fourth Circuit also vacated and remanded this Court's decision, *JP v. County School Board of Hanover County, Va.,* 2007 WL 840090, Civil Action No. 3:06cv028 (E.D.Va.2007), fixing the amount of attorneys' fees awarded to the parents, without addressing the merits of that decision. *Id.*

After remand, the parties determined that no further evidence was needed, but the case was rebriefed on the merits of the IDEA claim. On December 16, 2008, the Court entered an order and memorandum opinion in which, after according deference to the State Hearing Officer's decision, found in favor of the plaintiffs, holding that HCPS did not provide JP with a FAPE during the 2005–2006 school year because it did not proffer an IEP that was reasonably calculated to provide JP with an educational benefit and that Dominion was an appropriate placement for JP during the 2005–2006 school year. (Mem. Op. (*hereinafter JP III* ) at 77.) Pursuant to that holding, the Court found that HCPS was liable to JP's parents for the cost of educating JP for the 2005–06 school year at Dominion. (*Id.*) JP's parents were directed to file a statement of those costs. (Order dated December 16, 2008 (Docket Number 108).) JP's parents also were directed to provide a properly documented application for their attorneys' fees for the original litigation (*i.e., JP I* ), the appellate litigation (*i.e., JP II* ), and the pending litigation (*i.e., JP III* ). (Order dated December 16, 2008 (Docket Number 109).)

Both parties have now filed briefing on those issues. Their arguments about each

aspect of fees and costs will be discussed in the following sections. For the reasons set forth below, the Court will award the Plaintiffs $33,187.90 in damages, $307,150.20 in attorneys' fees, and $8,369.69 in litigation expenses for a total judgment in the amount of $348,707.79.

## DISCUSSION

### I. Damages

■ Under the IDEA, a court may order a public school system to reimburse parents for the cost of enrolling their child at an appropriate private school when the court finds that the public school had not made a free appropriate public education available to that child. *See* 20 U.S.C. §§ 1412(a)(10)(C)(ii), 1415(i)(2)(B)(iii). Therefore, the Plaintiffs are entitled to be reimbursed for the full, year-round cost of tuition for, and travel to and from, the Dominion School. *See M.S. ex rel. Simchick v. Fairfax County Sch. Bd.,* 553 F.3d 315, 325 (4th Cir.2009) (district courts have broad discretion in IDEA awards and such awards should be equitable); *A.K. ex rel. J.K. v. Alexandria City School Bd.,* 544 F.Supp.2d 487, 495–96 (E.D.Va.2008) (awarding transportation costs and full year tuition at a private placement to prevailing parents); *Petties v. District of Columbia,* 888 F.Supp. 165, 170–71 (D.D.C. 1995) (ordering school district to reimburse parents for summer tuition at appropriate private placement that operated year-round).

■ The Plaintiffs also are entitled to a reasonable rate of interest to compensate them for tuition payments made on their credit cards. The Court has broad discre-

tion to award appropriate relief in this case, and the 6% interest rate agreed to by the parties is appropriate.[2] *see Florence County Sch. Dist. Four v. Carter,* 510 U.S. 7, 15–16, 114 S.Ct. 361, 126 L.Ed.2d 284 (1993).

After the decision in *JP I,* the Court found that the cost attributable to educating JP at Dominion for the 2005–06 school year was $33,187.90. *See JP,* 2007 WL 840090, *10–11. The Plaintiffs' have reiterated their request for that amount. (Pl. Damages Mem. at 1.)

During the relevant time period, Dominion charged $2,500 per month in tuition, for a total of $30,000 for the 12–month school year. (Pl. Damages Stmnt. at 2.) The Plaintiffs also incurred $397.21 in credit card interest. (*Id.* at 4.) The Plaintiffs have produced documentation demonstrating that they incurred $1,627.63 in transportation expenses. (*Id.* at 5.) Finally, the Plaintiffs seek reimbursement for $350 in credit card processing fees—$50 for each tuition payment paid by credit card. (*Id.* at 2–3.)

■ As explained in the original opinion on damages, the transaction fees will be reimbursed because they were not expenses that could have been avoided by the Plaintiffs, unlike the credit card late fees and, arguably, the high credit card interest rates. *JP,* 2007 WL 840090, *10. HCPS has no objection to the calculation of tuition expenses, travel expenses, or the applicable interest rate. (Def. Damages Mem. at 2.) HCPS does, however, object to the $350 in credit card processing fees requested by the Plaintiffs, arguing that

---

**2.** In this phase of the case, the parties have not contested in their briefs the issue of the appropriate interest rate, presumably because the Court considered the issue in its first attorneys' fees opinion. In that opinion, the Court found that a 6% interest rate was appropriate, both because HCPS agreed to that rate and because "the rates requested by the Plaintiffs [the 13.25% and 25% interest rates on their credit card charges] would unfairly saddle the Defendant with costs that cannot be attributed exclusively to the Defendant's failure to abide by the IDEA." *JP,* 2007 WL 840090, *10.

the charges are undocumented and that the Plaintiffs have not identified to which tuition payments the credit card fees were connected.[3] (*Id.* at 1–2.)

That argument fails, however, because the Plaintiffs have documented this aspect of their claim. Plaintiffs' Exhibit B is a letter from Jennifer Wood, President of Dominion, which indicates that the Petersons paid $2550.00 per month to Dominion from December 2005 to August 2006—$50.00 more per month than monthly tuition at Dominion. That is consistent with the credit card statements provided by the Plaintiffs covering those months. (*See* Pl. Damages Stmnt. at Exs. G–M.) It is, therefore, clear from the record that the total payments made to Dominion during the 2005–06 school year, including tuition itself and necessary ancillary expenses, were $30,350 ($7,300 for the months of September through November, and 23,050 for the months of December through August). (*See id.* at Exs. A, B.) The total amount of damages owed by HCPS to the Plaintiffs, therefore, is $33,187.90.

## II. Attorneys' Fees and Costs

Under the IDEA, 20 U.S.C. § 1415(i)(3)(B), the Court "may award reasonable attorneys' fees as part of the costs to the parents of a child with a disability who is the prevailing party." The Plaintiffs have requested attorneys' fee awards under this statute for every stage of this case (*i.e., JP I, JP II,* and *JP III* ). (Pl. First Pet. at 1–2.) HCPS opposes the requested award of attorneys' fees for various reasons. (Def. First Obj. at 1, 18; Def. Second Obj. at 1.) Each of HCPS' contentions will be considered below.

## A. Offer of Judgment

The Defendant's broadest contention is that the Plaintiffs are not entitled to any award for attorneys' fees incurred after the Defendant made its offer of judgment. (Def. First. Obj. at 18.) Fed.R.Civ.P. 68 provides that a party defending against a claim may, more than 10 days before trial, make an offer of judgment to the claimant; if that offer is not accepted, and "the judgment that the offeree finally obtains is not more favorable than the unaccepted offer, the offeree must pay the costs incurred after the offer was made." The IDEA itself discusses the applicability of offers of settlement in IDEA claims:

> Attorneys' fees may not be awarded and related costs may not be reimbursed in any action or proceeding under section 615 of the Act for services performed subsequent to the time of a written offer of settlement to a parent if—
>
> (A) The offer is made within the time prescribed by Rule 68 of the Federal Rules of Civil Procedure or, in the case of an administrative proceeding, at any time more than 10 days before the proceeding begins;
>
> (B) The offer is not accepted within 10 days; and
>
> (C) The court or administrative hearing officer finds that the relief finally obtained by the parents is not more favorable to the parents than the offer of settlement.

20 U.S.C. § 1415(i)(3)(D)(i). This provision does not apply, however, "to a parent who is the prevailing party and who was

---

**3.** This unwarranted objection is a good example of how the contentious approach to this litigation taken by HCPS has increased the cost of the litigation. Of course, HCPS is free to take a contentious approach to defending the case, but it must be prepared to pay to the cost of so doing. *See Saleh v. Moore,* 95

F.Supp.2d 555, 583 (E.D.Va.2000). A reasonable examination of the record would have shown that the $350 expense was adequately documented and yet the Plaintiffs' counsel was required to address this issue and needlessly so.

substantially justified in rejecting the settlement offer." *Id.* at § 1415(i)(3)(E).

The IDEA explicitly provides that attorneys' fees are regarded as "part of the costs." 20 U.S.C. § 1415(i)(3)(B)(i). This statutory provision is highly significant in light of the Supreme Court's decision in *Marek v. Chesny*, in which it was held that, when a statute makes attorneys' fees part of the available relief, whether the Rule 68 offer is more favorable to the plaintiff than the final judgment is to be determined with reference to preoffer costs. *See* 473 U.S. 1, 6–7, 105 S.Ct. 3012, 87 L.Ed.2d 1 (1985); *see also Clark v. Sims*, 28 F.3d 420, 423 (4th Cir.1994) ("The Supreme Court has held that when Congress defines costs to include attorney's fees, those fees incurred after a rejected settlement offer may not be recovered by a plaintiff whose final judgment was less favorable than that offer."). Therefore, in order to be "more favorable," a lump-sum offer must be greater than the sum of the actual damages and the preoffer attorneys' fees and litigation costs. *See Marek*, 473 U.S. at 7, 105 S.Ct. 3012.

It is undisputed that on April 11, 2008, HCPS offered the Plaintiffs $137,697.47 and explicitly invoked both Fed.R.Civ.P. 68 and 20 U.S.C. § 1415(i)(3)(D)(i). (Def. First Obj. at Ex. 2.) This figure was arrived at by combining three elements: the $31,187.90 claimed by the Plaintiffs as actual damages; $3,419.57 in litigation costs; and, $101,097.00 in attorneys' and paralegals' fees. (*Id.*) The costs and damages figures were those approved in the Court's earlier attorneys' fees opinion. (*Id.*) The attorneys' fees themselves, however, were substantially ($78,462) lower than those awarded by the Court previously. (*See id.*); *see also JP*, 2007 WL 840090, *11.

HCPS makes a curious argument that the relative worth of its offer and the Court's final judgment should be computed as of December 16, 2008—the date that the Court found for the Plaintiffs on the merits after remand. (Def. First Obj. at 19.) In the Memorandum Opinion and Orders issued that day, however, the Court indicated that it was not yet able to compute the appropriate amount of the award, and required further statements of damages and costs. (*See JP III* at 76–77; Order, December 16, 2008 (Docket Number 109).) Thus, as of December 16, 2008, the Court had not yet ascertained the amount of damages (which HCPS continues to litigate) or the preoffer costs. Comparison of the amount of the offer to the "relief finally obtained" by the Plaintiffs was, therefore, impossible until, essentially, today, when the amount of that relief was determined. 20 U.S.C. § 1415(i)(3)(D)(i). Because the amount of relief respecting preoffer costs is greater than that offered by HCPS, that offer was not "more favorable" than the award, and 20 U.S.C. § 1415(i)(3)(D)(i) does not limit the Plaintiffs' fee award.

Even if subsequent computation had shown the offer made by HCPS to be more favorable than the Plaintiffs' eventual recovery, Plaintiffs' postoffer fees would still be recoverable because the parents were "substantially justified" in rejecting that offer. *See* 20 U.S.C. § 1415(i)(3)(E). While there is a paucity of precedent interpreting the phrase "substantially justified," most courts addressing the issue have found substantial justification when the Plaintiffs had a good faith, reasonable belief that their eventual recovery would be higher than the offer. *See, e.g., B.L. through Lax v. District of Columbia*, 517 F.Supp.2d 57, 61 (D.D.C.2007) (parents were substantially justified in refusing offer when recoverability of expert costs under IDEA was still in question and offer did not include those costs); *R.N. v. Suffield Bd. of Educ.*, 194 F.R.D. 49, 52–53 (D.Conn.2000) (parents were substantially

justified in rejecting offer when their legal argument respecting recoverability of costs not reflected in offer was not trivial). Furthermore, as the court in *B.L.* pointed out, the legislative history of the IDEA supports that construction. *See B.L.*, 517 F.Supp.2d at 61 (quoting H.R. Conf. Rep. No. 99–687, at 6 (1986), 1986 U.S.C.C.A.N. 1807, at 1809) ("Substantial justification for rejection would include relevant pending court decisions which could have an impact on the case in question.").

As explained above, when HCPS made its offer, the amount of preoffer attorneys' fees that the Plaintiffs would recover was still in question. Furthermore, the amount of preoffer attorneys' fees awarded to the Plaintiffs in the Court's earlier, vacated, award was substantially higher than that offered by HCPS. *See JP*, 2007 WL 840090, *11. More importantly, the Plaintiffs had prevailed on the merits of the claim (in *JP I*) and the Fourth Circuit did not address the merits on appeal. Given the strong record that supported the correctness of their position, the Plaintiffs had a reasonable basis for believing that they would prevail at the trial after remand and, if so, that the amount of attorneys fees awarded would be greater than previously awarded. *See JP II*, 516 F.3d at 263. Therefore, the Plaintiffs were substantially justified in refusing the offer made by HCPS, because a court decision with an impact on the amount of the award was pending, and they had a reasonable, good faith belief that their eventual award would be more favorable than the offer.

**B. Prevailing Party**

■ The Plaintiffs also have tendered a claim for attorneys' fees for their work in *JP II*, the defense of HCPS' appeal of this Court's first decision in their favor. (Pl. Second Pet. at 1.) The IDEA provides that an award of attorneys' fees may be granted to a parent making an IDEA claim if that parent is the "prevailing party" in the litigation. 20 U.S.C. § 1415(i)(3)(B)(i)(I).

■ A party need not prevail on all claims in order to be regarded as the prevailing party because enforceable, material final relief on any IDEA claim is sufficient to make one a prevailing party. *See G ex rel. RG v. Fort Bragg Dependent Schools*, 343 F.3d 295, 310 (4th Cir.2003) *see also Farrar v. Hobby*, 506 U.S. 103, 111–12, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992) (A prevailing party is one who receives "actual relief on the merits of his claim [that] materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff."). A party is "prevailing" where it can "point to a resolution of the dispute which changes the legal relationship between itself and the defendant." *Tex. State Teachers Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 792, 109 S.Ct. 1486, 103 L.Ed.2d 866 (1989).

It is true, as HCPS argues, that a party who loses on appeal ceases, at that point, to be a prevailing party. *See Figg v. Schroeder*, 312 F.3d 625, 644–45 (4th Cir. 2002). However, that general statement does not answer the issue presented in this case: whether a party who loses on appeal that does not resolve the merits of a substantive claim but who wins on the remand following the appeal is nonetheless a prevailing party in the litigation so that the party can recover attorney fees incurred in defending the appeal.

The Fourth Circuit has recognized circumstances in which a party who loses during a particular appellate proceeding might still be awarded attorneys' fees as a prevailing party. For example, in *Plyler v. Evatt*, 902 F.2d 273 (4th Cir.1990), the Court of Appeals affirmed an "award of fees to plaintiffs' attorneys in some post-[consent] decree litigation, a portion of

which the plaintiffs lost on appeal." *Id.* at 275. In *Plyler*, a class action brought by prison inmates against the state department of corrections was resolved by a consent decree. After that decree was entered, the department of corrections moved to modify the consent decree. *Id.* The plaintiffs successfully opposed the modification in the district court but the Fourth Circuit reversed part of the district court's judgment on the motion to modify. *Id.* at 279. Subsequently, the district court was called upon to assess attorneys' fees for the litigation of the motion to modify and awarded fees to the plaintiffs for work on the unsuccessful appeal. *Id.* The Fourth Circuit affirmed that decision because plaintiffs' counsel were obligated to defend the appeal as part of their effort to preserve the fruits of their earlier victory in securing the consent decree. *Id.*

The Fourth Circuit reached a similar result in *Perry v. Bartlett*, 231 F.3d 155, 162 (4th Cir.2000) wherein a plaintiff, who later prevailed on his claims, was awarded attorneys' fees for work on an unsuccessful interlocutory appeal of the district court's denial of his motion for a preliminary injunction. The defendant opposed an award of fees for work on the appeal because the plaintiffs did not prevail. *Id.* at 163. The Fourth Circuit found that argument "unconvincing" because "entitlement to fees for one aspect of a protracted litigation does not turn narrowly on whether the party prevailed on that particular matter, but whether a separate claim or, as here, a separate proceeding is so unrelated as to justify treating it as a separate lawsuit." *Id.* at 163 (quoting *Plyler v. Evatt*, 902 F.2d 273, 280 (4th Cir.1990)). The district court's award of fees for the

unsuccessful interlocutory appeal was upheld because the appeal was "related to the case in chief." *Id.*

More recently, in *Nigh v. Koons Buick Pontiac GMC, Inc.*, 478 F.3d 183, 188–89 (2007), the Fourth Circuit faced a situation similar to the one presented here. In *Nigh*, a plaintiff prevailed on a Truth–in–Lending Act claim in the district court, and, under the fee-shifting provision in that statute, was awarded attorneys' fees.[4] *Id.* 184–85. The defendant appealed to the Fourth Circuit, which upheld the district court's damages ruling and added to the fee award for work performed in the appeal. *Id.* The defendant thereafter appealed to the Supreme Court of the United States, which reversed the damages ruling made by the district court and affirmed on appeal, thereby reducing, though not eliminating, the plaintiff's recovery on the merits. *Id.* The case then was remanded to the district court for a renewed determination of the damages and fees awarded. *Id.*

On remand, the district court awarded the plaintiff attorneys' fees, *inter alia,* for the services involved in the losing effort before the Supreme Court. *Id.* at 189. The defendant appealed that award, and the Fourth Circuit took up the issue whether it was "patently unreasonable" to award fees to a party who had lost on the appeal of a particular issue, but who remained the overall prevailing party. *Id.* at 188.

■ The case was decided under the Truth–in–Lending Act, but the Fourth Circuit began its analysis by analogizing that statute's fee-shifting provision to other similar statutory provisions, such as 42

---

4. The Truth–in–Lending Act provides, in relevant part, that:

 [A]ny creditor who fails to comply with any requirement imposed under this part ... with respect to any person is liable to such person in an amount equal to ... in the

case of any successful action to enforce the foregoing liability ... the costs of the action, together with a reasonable attorney's fee as determined by the court.

15 U.S.C. § 1640(a)(3).

U.S.C. § 1988(b). *See id.* The analogy between Truth–in–Lending Act actions and IDEA actions is perhaps even more apt, because IDEA has a salient feature respecting damages in common with the Truth–in–Lending Act: the awards under the two statutes "will rarely be enough to cover the costs of representation; in most cases, they scarcely will cover the costs of filing a claim. Only with fee shifting does the prosecution of a typical individual TILA claim become an economically sensible possibility." *Id.* (internal citations omitted). Furthermore, as in the IDEA context, "Defendants in [Truth–in–Lending Act] suits are more likely to be repeat violators than plaintiffs are to be repeat victims ... [T]he risk of losing more in costs and fees than is gained in refunded damages in one particular appeal may well be a risk worth taking: what is lost in fees in that case may be saved in damages in a later one." *Id.* (internal citations omitted).

Considering that the two statutes operate in similar contexts, the Fourth Circuit's analysis of fee shifting provisions in the Truth–in–Lending Act context is useful in applying the fee shifting provisions of IDEA. While the Fourth Circuit recognized the apparent unreasonableness of granting prevailing party attorneys' fees to a party who lost on appeal, it noted that "[the defendant] knew or should have known that by appealing only the question of damages to the Supreme Court it risked losing more in fees and costs than it stood to gain in refunded damages." *Id.* at 189. Therefore, in a very real sense, defendants facing statutes with fee shifting provisions assume the risk of raising attorneys' fee awards with appeals that do not render a suit unsuccessful. *See id.* at 188–89.

Assessing whether the Plaintiffs may be awarded attorneys' fees for their unsuccessful defense on appeal therefore requires addressing two issues. First, was the appeal "related to the case in chief?"

Second, was the defense necessary to preserve the Plaintiffs' prior victory? *See Perry*, 231 F.3d at 163; *Plyler*, 902 F.2d at 281.

It is not reasonably disputable that the Plaintiffs' defense of HCPS' appeal was necessary. HCPS appealed essentially every material issue in the case. If the Plaintiffs had not defended against the appeal, the victory they secured in the district court would have been lost by default.

Further, there can be little doubt that the nexus component of the analysis was satisfied because the appeal covered all aspects of the case. That nexus was not altered by the fact that the Court of Appeals reversed the district court's judgment on the limited ground that the hearing officer's decision was not afforded the appropriate degree of deference and that, on that basis alone, the district court judgment was vacated and remanded for further proceedings, there being no judgment on the merits on the appeal. Thus, notwithstanding the fact that the appeal was not decided on the merits of the Plaintiffs' claim, it simultaneously was certainly not so unrelated "as to justify treating it as a separate lawsuit." *Perry*, 231 F.3d at 163. Indeed, the appeal in this case was far more closely related to the merits of the case than that for which fees were awarded in *Nigh*, where the appeal involved only the question of the statutory damage cap. *See* 478 F.3d at 189. Under the principles announced by *Plyler*, *Perry* and *Nigh*, therefore, it certainly is reasonable to award the Plaintiffs fees for defending the appeal.

In sum, the Plaintiffs prevailed in the district court originally and again following remand. Considering that, the nexus requirement, and the fact that it was necessary for the Plaintiffs to defend the appeal in order to secure the fruits of their origi-

nal victory, which they now have done on remand, it is appropriate to consider the Plaintiffs to be prevailing parties in the action.

## C. Lodestar Analysis

 The amount of attorneys' fees awarded to prevailing IDEA plaintiffs "shall be based *on rates prevailing in the community* in which the action or proceeding arose for the kind and quality of services furnished." 20 U.S.C. § 1415(i)(3)(C) (emphasis added). Pursuant to that direction, and under the basic principles applicable to the award of attorney's fees in IDEA and civil rights cases generally, the "starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Hensley v. Eckerhart,* 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983); *see also A.D. ex rel. S.D. v. Bd. of Pub. Ed. of the City of Asheville,* 99 F.Supp.2d 683, 687 (W.D.N.C.1999) (applying *Hensley* and related cases in the IDEA context). The result of that calculation is known as the lodestar figure. If properly computed, "the lodestar figure will normally reflect a reasonable fee." *A.D.,* 99 F.Supp.2d at 687 (citation omitted). To arrive at the lodestar figure, it is necessary to determine the appropriate hourly rate and the number of hours reasonably expended. Those two variables, as well as the lodestar figure itself, are assessed in light of the twelve factors set forth in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 717–719 (5th Cir.1974). *E.E.O.C. v. Service News Co.,* 898 F.2d 958, 965 (4th Cir.1990).

The twelve *Johnson* factors are: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the level of skill required to perform the legal service properly; (4) the preclusion of employment by the attorney due to the acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. 488 F.2d at 717–719. Using those factors, and other relevant decisional law, as a guide, the Court turns first to the determination of a reasonable hourly rate.

### 1. Reasonable Hourly Rate
#### a. Standard of Review

The IDEA instructs that a reasonable rate is the one "prevailing in the community in which the action or proceeding arose for the kind and quality of services furnished." 20 U.S.C. § 1415(i)(3)(C). The Fourth Circuit recently has noted that:

> [D]etermination of the hourly rate will generally be the critical inquiry in setting the reasonable fee, and the burden rests with the fee applicant to establish the reasonableness of a requested rate. In addition to the attorney's own affidavits, the fee applicant must produce satisfactory specific evidence of the prevailing market rates in the relevant community for the type of work for which he seeks an award. Although the determination of a market rate in the legal profession is inherently problematic, as wide variations in skill and reputation render the usual laws of supply and demand largely inapplicable, the Court has nonetheless emphasized that market rate should guide the fee inquiry.

*Robinson v. Equifax Information Services, LLC,* 560 F.3d 235, 244 (4th Cir. 2009) (quoting *Plyler,* 902 F.2d at 277). The Fourth Circuit has defined "market rate" as "what attorneys earn from paying clients for similar services in similar cir-

cumstances, which, of course, may include evidence of what the plaintiff's attorney actually charged his client." *Id.* (quoting *Depaoli v. Vacation Sales Assocs., L.L.C.,* 489 F.3d 615, 622 (4th Cir.2007)). The relevant community for purposes of this case is Richmond, Virginia and the Eastern District of Virginia, as that is where the action and proceeding both arose. *See County School Bd. of York County, Virginia v. A.L.,* 2007 WL 756586, *7–8 (E.D.Va.2007) (Morgan, J.) (unreported); *Board of Educ. of Frederick County v. I.S. ex rel. Summers,* 358 F.Supp.2d 462, 471 (D.Md.2005).

 The market rate for similar services in the community may be established "through affidavits reciting the precise fees that counsel with similar qualifications have received in comparable cases; information concerning recent fee awards by courts in comparable cases; and specific evidence of counsel's actual billing practice or other evidence of the actual rates which counsel can command in the market." *Spell v. McDaniel,* 824 F.2d 1380, 1402 (4th Cir.1987); *see also Robinson,* 560 F.3d at 245–46 (discussing use of affidavits to prove the relevant market rate).

### b. Hourly Rate: Mr. Strother

 The record contains affidavits addressed to the prevailing rate in the community for the kind and quality of services furnished, and evidence of the billing practice of Plaintiffs' counsel, and evidence of a recent fee award.

In this case, the Plaintiffs and their counsel executed a retainer agreement on July 29, 2005. It set a "reduced rate" of $165 per hour for Mr. Strother, $135 per hour for associates, and $80 per hour for paralegal assistants. The retainer, however, provides that, if the Plaintiffs prevail, the requested fees shall be based on "rates prevailing in the community in which the proceedings arose." Mr. Strother's affidavit explains that he extends a reduced rate "in special education matters because of the inability of middle and lower income clients to pay a higher rate." (Strother Aff. Ex. F, ¶ 10). He also avers that, "based on his experience, without this substantial reduction, the majority of parents would forego attempts to advocate their rights under IDEA." (*Id.*)

Mr. Strother's affidavit further reports that the prevailing hourly rates in the communities for the kind and quality of the services he furnished range between $350 and $400 per hour for lead counsel and $225 to $290 per hour for associates. (*Id.* at ¶ 10.) And, his current rate for special educational matters is $250. (*Id.*) The rate charged by Mr. Strother's firm for associates' services in such matters is $190 per hour. (*Id.* at ¶ 11.)

Plaintiffs submitted six affidavits, which, considered individually and collectively, attest that, for the kind and quality of service performed by Mr. Strother the prevailing hourly rate is $350 in the Eastern District of Virginia including Richmond.[5] Many of those affiants also had submitted affidavits in 2006 in support of the fee application filed previously. At that time, those affiants also attested, with less specificity, that the then prevailing rate in the community was $350 as well. The affida-

---

**5.** HCPS submitted no affidavits addressing hourly rates. However, in opposing the previous fee award, HCPS tendered two affidavits, one which asserted that the prevailing rate was between $250 and $350 per hour; one which posited a rate of $180 to $240 per hour. The first affidavit offered supports the Plaintiffs' evidence. The second was based on the affiant's own rates in representing school boards which, of course, is a somewhat different market than the one in which lawyers who represent plaintiffs function, and the Plaintiffs' proofs represent that segment of the market which, of course, is the one here at issue.

vits also attest to Mr. Strother's fine reputation as a lawyer in the field of special education law. Several of the affidavits reflect familiarity with the case (apparently from reading the published opinions) and opined that it was a relatively complex case for its genre.

However, most of the affidavits also reflect that the $350 hourly rate is the one commanded by lawyers with considerably more experience that Mr. Strother's. Indeed, three affiants had more than twenty-five years in practice and two had practiced for fourteen and ten years, respectively. Mr. Strother had been in practice six years when he undertook the representation and this was his first IDEA case.

The affidavits also reflect that there are not many lawyers in the area who accept IDEA cases. The affidavits suggest that is attributable to the fact that those in need of such services are able to pay only discounted rates. Nonetheless, the record establishes that the going rate for experienced counsel in IDEA cases in the Eastern District of Virginia, including this division, is $350 per hour. *See, e.g., County School Bd. of York County, Virginia v. A.L.,* 2007 WL 756586, \*8 (E.D.Va.2007) ($350 hourly rate approved for lead counsel).

HCPS's first ground of opposition to Mr. Strother's requested rates of $300 and $350 per hour [6] is that he lacks the experience of the affiants who support the $350 per hour prevailing rate. To be sure, the record shows that this is Mr. Strother's first IDEA case. The record also establishes that Mr. Strother, who had been in private practice six years when he took on this case, has a fine reputation as a practitioner in special education law. Mr. Strother's ability was demonstrated in this case. To put it simply, he took over a case

after it had started before the State Hearing Officer and effectively built the factual record which allowed the Plaintiffs to prevail here.

The basic legal precepts on which an IDEA case is based are not themselves complex. However, as shown by the record, the factual issues which animate the legal principles are quite complex. In particular, it is necessary for a lawyer to work his way through quite complex and often confusing public educational records and assess the conclusions of public educators in perspective of experts in the education of autistic children. Then all of that must be sorted and presented by effective use of the records, effective cross-examination of witnesses, and mustering an effective presentation of expert witnesses. This case called for the exercise of considerable skill on the part of Mr. Strother, and his experience in handling special education cases in other contexts was apparent in the skillful and effective way in which the factual record here was developed and in which expert evidence in support of JP's case was assembled and presented.

The reputation, skill and experience of a lawyer are the constituent components of the 9th *Johnson* factor. HCPS has made no criticism of Mr. Strother's reputation or skill. Indeed, the record shows that he has a fine reputation in special education law. As discussed above, the record in this case illustrates a substantial level of skill in trying any IDEA case, even though it was his first case of this sort.

Mr. Strother's experience level is significant here because the record shows that the $350 rate is at the top of the range for such cases for lawyers much more experienced than Mr. Strother. Thus, says HCPS, the experience factor warrants a

---

**6.** Mr. Strother seeks $300 per hour for services in *JP I* and $350 per hour in *JP II* and *JP III.*

departure downward from the prevailing $350 per hour rate in the community.[7]

 That argument ignores the fact that the statute bases the rate on the prevailing community rates for the "kind and quality of services furnished." It does not explicitly mention the experience of the lawyer. However, experience is rightly equated with skill, and experience is a generally recognized factor in setting lawyers' rates. Thus, it is appropriate to make a downward adjustment to account for limited experience. However, where as here, the lawyer demonstrated a quite good skill level and prevailed in the case that adjustment should only be a small one. That is especially true considering that "experience" is only one component of the 9th *Johnson* factor, and thus the lawyer's lesser experience is a relevant, but not determinative, factor.

Considering all the foregoing and the record as a whole, the Court concludes that a reasonable rate for Mr. Strother's services is $300 per hour. Notwithstanding that, during the unfortunately protracted course of this case, Mr. Strother has gained valuable experience, there is no basis for establishing a different fee level for services provided in *JP II* and *JP III* than in *JP I* based on the 9th *Johnson* factor.

The second objection made by HCPS to the requested prevailing hourly rate of $350 for *JP II* and *JP III* and even to the requested rate of $300 for *JP I* also is grounded, so says HCPS, in the 9th *Johnson* factor. (Def. First Obj. at 7 (citing Transcript of December 6, 2007 Argument at 9–10).) This argument actually is founded upon a Court-counsel exchange

during oral argument in the Court of Appeals:

THE COURT: What's the difference? You make a distinction. A market rate is what an attorney can receive.

MR. ALLEN: Well, not, not from clients that IDEA and other civil rights—

THE COURT: Well, that's a terribly bad confession on your part, because that's exactly what the market is. The market is what attorneys doing that type of practice get. And if, if you're making a truthful observation that many of the plaintiffs are parents who are not wealthy and can't afford a lot of money and, of course, is a fee transfer in these cases.

(*Id.* at 7.) From that springboard, HCPS posits that, when IDEA specifies the rate prevailing in the community for the kind and quality of services furnished, the statute actually means the hourly rate that the plaintiff's lawyer, and only the plaintiff's lawyer, charges. (*Id.* at 7–9.) Interestingly, HCPS never stakes out a position respecting whether it is the rate that Mr. Strother charged the parents ($165 per hour) or the rate he charges in his special education practice ($250 per hour). In any event, piggybacking on a statement made in the Court-counsel exchange, HCPS argues that the market rate in IDEA cases is the rate that IDEA and other civil rights plaintiffs can afford to pay, an argument which, of course, harkens back to the statement: "A market rate is what an attorney can receive." (*Id.* at 7–8).

 There is no doubt that the fee actually charged is relevant in determining a reasonable hourly rate. *See Robinson,*

---

7. HCPS notes (but it makes no substantive point about) the fact that one of the affiants does not live in the Richmond Division of the Court. However, lawyers from each division, the Richmond Division and the Norfolk/New-port News and the Alexandria Divisions routinely practice in the other divisions and the record shows that the prevailing rate for IDEA cases is essentially the same in each division.

2009 WL 656814, *7. Indeed, the Fourth Circuit previously has noted that "market rates may be proved by the rate clients normally and willingly pay the petitioning attorneys." *Rum Creek Coal Sales, Inc. v. Caperton*, 31 F.3d 169 175 (4th Cir.1994). That, however, does not mean that the rate normally charged and paid is the prevailing rate in the community or that such datum is the only factor to be considered in determining the prevailing community rate.

In fact, if Congress had wanted IDEA attorneys' fees for prevailing plaintiffs to be the hourly rate normally received by plaintiff's counsel, it could have said precisely that. It did not. Instead, Congress used different words, and courts are obligated to give the words of Congress effect. Congress, of course, was not acting irrationally by choosing the prevailing rate in the community, rather than the rate that the lawyer usually charges. For example, suppose that a plaintiff retains a lawyer to try a case and the lawyer is the preeminent trial lawyer in town and he charges and is paid $600 per hour for the trial work in the IDEA case. Could that lawyer be awarded a fee using that hourly rate when the record showed that the prevailing rate in the community was $350 per hour? Certainly not. What if, on the other hand, that case had been handled *pro bono* by a lawyer who was independently wealthy and routinely charged clients $100 per hour to cover overhead? Would her fee under IDEA be limited to $100 per hour? Not if the Congressional text is to be given effect.

Rather clearly, by specifying the prevailing rate in the community, Congress looked beyond the rate which the plaintiff's lawyer usually charges and receives. Congress chose that measure to provide incentives to lawyers to take IDEA cases. *See* 132 Cong. Rec. 16,823 (statement of Sen. Weicker) ("Without this remedy, many of our civil rights would be hollow pronouncements available only to those who could afford to sue for enforcement of their rights.") Here, the record shows that the prevailing rate in the community is $350 per hour for the lead partner.

However, it is also settled that the other *Johnson* factors must be taken into account in setting the fee, mindful of the fact that Congress did not intend the fee shifting provision to provide a windfall to plaintiff's counsel. *Trimper v. City of Norfolk*, 58 F.3d 68, 73 (4th Cir.1995).

The other *Johnson* factor most pertinent to ascertaining a reasonable hourly rate is factor 5, the customary fee for such service. The record here shows that the range for fees customarily charged is a low of $150 to a high of $350 per hour, but that fee agreements usually specify that, if the plaintiff prevails, the plaintiff's lawyer will seek attorney's fees based on the prevailing community rate as provided in the IDEA.

Taken as a whole, and considered in perspective of *Johnson* factors 5 and 9, the ones that are most pertinent to the reasonableness of an hourly rate, the reasonable rate for Mr. Strother is the $350 prevailing market rate reduced to $300 per hour to account for his lower level of experience in IDEA cases and to reflect recognition that his customary fee for special education cases is $250 per hour.

### c. Hourly Rates: Associates

 Several associates worked on JP's case during its long history. The primary associate during *JP I* was Krista Mathis who had been an attorney for only a few years before her involvement with JP's case, and she had no IDEA experience other than as a summer intern and through attending IEP meetings. (Pl. First Pet. at Ex. C. p. 829.) The primary associate during the *JP II* phase of the litigation was Robert J. Allen. Other than

a cursory mention of his ability in Mr. Strother's affidavit, no information is provided about Mr. Allen. The primary associate during *JP III* was Audrey Burges. Ms. Burges was admitted to the Bar in 2006 and had no relevant IDEA experience before her involvement in this case, though she has gained relevant experience since joining the firm. (Burges Aff. at ¶¶ 1–3.) Anastasia K. Jones also provided legal services during *JP III*, but no information about her experience is provided.

The supporting affidavits submitted by the Plaintiffs show that the prevailing rates for associates in cases such as this ranges between $225 and $290 per hour. (Strother Aff. ¶ 9; Reichhardt Aff. ¶ 5; Butler Aff. ¶ 7.) However, Mr. Butler's affidavit relates to services provided in litigation other than the IDEA. Without that affidavit, there is no support for an associate rate of $290. The Plaintiffs' relevant evidence on associates' rates is the $225 figure proffered by Mr. Reichhardt and the $190 rate charged usually by Mr. Strother's firm.

HCPS contests the requested $200 and $230 hourly rates charged for associate work. (Def. First Obj. at 8.) As an initial matter, HCPS is correct that the Plaintiffs have provided the Court with no background on associates Robert J. Allen or Anastasia K. Jones, so it is impossible for the Court to assess the rate requested for them in light of their experience. Accordingly, it is not possible to base any part of the award on services which they performed. This results in a reduction of 126.5 associate hours.

The primary associate on this case, Ms. Mathis, had only three years experience as an attorney when this matter first went to trial and, considering *Johnson* factor 9, an hourly rate of $190 is more appropriate than the requested rate of $230. This is no commentary on her skill or performance with respect to this particular matter, but instead reflects the Court's experience with billing rates in the Richmond area for young attorneys who have been practicing law for as long as Ms. Mathis.[8] A lesser hourly rate is also appropriate for associate Audrey J. Burges, who began practicing law in 2006, and thus necessarily has limited experience. (Pl. Ex. G ¶¶ 2, 3.) Her rate is best set at the $190 rate that the firm usually charges for associates, rather than the higher rate of $230 per hour for more experienced associates.

### d. Hourly Rate: Paralegal Assistants

■ There are no affidavits reflecting the rates charged for paralegal services in IDEA cases in the community. The Plaintiff's fee application recites that the prevailing community rate for such services is $105 per hour, but no supporting documentation is provided to confirm this figure, The rate actually charged the Plaintiffs, as set forth in the Retainer Agreement, was $80 per hour. In the absence of any evidence in the record concerning the prevailing community rate for paralegal fees, the Court will award those fees at the rate actually charged to the Plaintiffs.

In sum, the Court finds that, in light of the relevant *Johnson* factors and the applicable law, that $300 per hour for Mr. Strother, $190 per hour for Mathis and Burges, and $80 per hour for paralegal services reflects the general community rate, as well as the skill and experience of those professionals while, at the same time, appropriately accounting for their relative inexperience with IDEA actions such as this and the customary rate for each level of service.

---

**8.** In the previous fee opinion, her compensable rate was set at $200 per hour. Upon further reflection the proper rate ought to be $190 in view of her relative inexperience.

### 2. Number of Hours Reasonably Expended

■ Next, it is necessary to review the second half of the lodestar analysis: the number of hours reasonably expended on behalf of the Plaintiffs. Under the IDEA, the Court is obligated to reduce a fee award if "the time spent and legal services furnished were excessive." 20 U.S.C. § 1415(i)(3)(F)(iii). For that reason, "[t]he Court may not simply accept as reasonable the number of hours reported by counsel," and the fee applicant bears the burden of providing the Court with sufficient evidence to justify its fee request. *A.D.*, 99 F.Supp.2d at 690. That burden includes supplying documentation which "reflects reliable contemporaneous recordation of time spent on legal tasks that are described with reasonable particularity, sufficient to permit the court to weigh the hours claimed and exclude hours that were not 'reasonably expended.'" *Guidry v. Clare*, 442 F.Supp.2d 282, 294 (E.D.Va. 2006) (citations and internal quotation marks omitted).

The Plaintiffs request reimbursement for a total of 669.7 hours of partner time (401.8 for *JP I*, 208.5 for *JP II*, and 59.4 for *JP III*), 929 hours of associate time (482.4 for *JP I*, 283.5 for *JP II*, and 163.1 for *JP III*) and 236.9 hours of paralegal time for the combined litigation (48.5 for *JP I*, 106.5 for *JP II*, and 81.9 for *JP III*). (Pl. First Pet. at 1–4.) HCPS raises several arguments concerning these statements of hours expended; each of these arguments will be dealt with in turn.

The second *Johnson* factor requires that the number of hours expended be reasonable in light of the difficulty and novelty of the legal questions at issue. *See* 488 F.2d at 717–719. While this litigation has certainly presented some difficult and novel questions of law, there are a few claims of time expenditures claimed by the Plaintiffs that are clearly unreasonable.

■ First, the 156.3 hours of attorney time claimed for preparation of the Complaint are clearly excessive. (Pl. First Pet. at Ex. C pp. 324–28.) While the Complaint was factually very thorough and obviously required a great deal of time to draft, it also needlessly detailed seven separate counts which ultimately went only to a single question: whether the 2005 IEP complied with the IDEA. While the facts underlying those separate counts were critical to the Plaintiffs' success on the merits, the unnecessary recitation of the separate counts demonstrates a lack of experience that undoubtedly contributed to the excessive number of hours required to prepare the Complaint. Considering the Complaint, the law applicable to the relief it sought, and the record, the Court will award 50 hours, charged at the partner rate, for preparation of the complaint. This is a reduction of 11.1 partner hours and 89.1 associate hours from the claimed total.

■ Second, the 60 consecutive hours of dedicated preparation time for oral argument before the Fourth Circuit claimed by Mr. Strother are also excessive. (Pl. Second Pet. at Ex. C.) Beyond question, preparing oral argument before a federal Court of Appeals is surely a daunting task and a most important one that requires a great deal of preparation, 60 consecutive hours of vaguely described "preparation" time for oral argument by an attorney already intimately familiar with the applicable law and factual background is not reasonable. Considering the size of the record, the nature of the legal issues and the nature of the details in the record, preparation reasonably could have been accomplished in three eight-hour days. A total of 24 hours therefore will be allowed as reasonable.

HCPS also objects to "the number of hours spent in duplicative and repetitive

work." (Def. First Obj. at 14 (quoting *Conklin v. Anne Arundel County Bd. of Educ.*, 946 F.2d 306, 316 (4th Cir.1991)).) Most of the so-called "duplicative" time complained of relates to the time claimed by attorneys Mathis and Burges and law clerk Matthew Farley,[9] who, not being involved in the litigation from the beginning, billed several hours each in preparation time. (*Id.* at 14–15.) As the Defendant knows full well, complex legal work requires a large amount of collaboration, it is in no way unreasonable for an individual who joins a team of attorneys in the midst of litigation to spend some amount of time preparing for further participation in that litigation. Furthermore, the amount of time claimed by Mr. Burges, Mr. Mathis, and Mr. Farley for such necessary preparation time is not unreasonable. Therefore, the award will not be reduced on that basis.

■ HCPS objects to several other time entries as reflecting activities not properly recoverable because they represent clerical or administrative tasks. (Def. First Obj. at 17; Def. Second Obj. at 9, 10.) This objection folds together with HCPS' final objection that the time records provided by the Plaintiffs are inappropriately "lumped." (Def. Second Obj. at 7–8.) The "lumping" cited by the Defendant refers to the practice of listing several tasks under a single time entry, without specifying the amount of time spent on a particular task. *Guidry*, 442 F.Supp.2d at 294.

For example, the Plaintiffs request reimbursement for activities such as speaking with local news reporters, "develop[ing]" binders, making copies, faxing forms, and similar activities. (Pl. First Pet. at Exs. C, E; Pl. Second Pet. at Ex. C.) Many of the Plaintiffs' time entries reflect several different activities occurring during a single time entry,[10] and many of them combine apparently clerical tasks with tasks requiring attorney judgment.[11] Indeed, in one instance, a time entry includes a request for reimbursement for a conversation with a local newspaper reporter. (Pl. Second Pet. at Ex. C.) The regularity with which these lumped time entries appear in the Plaintiffs time records makes parsing out particular activities impossible. While the Plaintiffs are correct that keeping accurate time records is a difficult and challenging enterprise, that does not excuse them from the obligations to maintain such records. (*See* Pl. Second Rep. at 12.)

■ The lack of specificity in the Plaintiffs time records render it impossible

---

9. HCPS objects to the inclusion in the award of any compensation for the hours spent by Mr. Farley because the Plaintiffs have not provided information as to his background. (Def. First Obj. at 15.) As is explained in the Plaintiffs' briefing, Messrs. Farley and Manos were student law clerks employed by the firm who worked on this litigation and were billed at the paralegal rate. (Pl. First Rep. at 5 n. 5.) He is, therefore, not a "consultant" under the meaning of the decision in *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 297–300, 126 S.Ct. 2455, 165 L.Ed.2d 526 (2006). Furthermore, detailed information concerning the qualifications of Messrs. Farley and Manos are not required because they performed paralegal work and were billed at paralegal rates. Their time can be compensated at $80 per hour.

10. For example, the following time entry reflects activities taken during 0.60 hours on June 12, 2008: "Convo with Ms. Hooper re courtesy copies and paper Filings; email to PCS and AJB; convo with Ms. Chou re consistent format pleasing and courtesy copies; Email to AJB/PCS." (Pl. First Pet. at Ex. E.)

11. For example, the following time entry reflects activities taken during 1.20 hours on July 25, 2008: "Develop pleadings and order binder; hand file Objection to Hanover's second submission; convo with L. Peterson deny for extra pages and second submission." (*Id.*)

to determine the amount of time attributed to non-recoverable activities or the appropriate rate at which the Plaintiffs may recover for any given activity. *See Hensley*, 461 U.S. at 434, 103 S.Ct. 1933 ("Hours that are not properly billed to one's client also are not properly billed to one's adversary pursuant to statutory authority."); *Superior Form Builders v. Dan Chase Taxidermy Supply Co., Inc.*, 881 F.Supp. 1021, 1027 (E.D.Va.1994), *aff'd*, 74 F.3d 488 (4th Cir.1996) (paralegal cannot recover paralegal rates for clerical tasks). Where "lumping" or other inadequate documentation is present in a fee application, courts may either identify and exclude improperly documented hours or simply reduce the overall fee award "by a fixed percentage or amount based on the trial court's familiarity with the case, its complexity, and the counsel involved." *Guidry*, 442 F.Supp.2d at 294. The "lumping" in this case will require, therefore, a 10% reduction in the hours reported.

■ HCPS further objects to time charged by the Plaintiffs for conversations with what it describes as "experts" or "consultants." (Def. Second Obj. at 6–7.) It is undisputed that IDEA plaintiffs are not entitled to "recover the costs of experts or consultants." *Murphy*, 548 U.S. at 300, 126 S.Ct. 2455. HCPS argues that, because the Plaintiffs may not recover the direct costs of experts' services (*i.e.*, bills for the experts' time), they similarly may not recover for their own time spent conversing with those experts or consultants. (Def. Second Obj. at 6.)

There has been no decision interpreting the *Murphy* holding as it pertains to attorney billable hours for consulting with experts, but the Court need not take up that issue in this case. That is because, as an initial matter, most of the time entries objected to by HCPS do not represent interactions with outside consultants or experts. (*See* Pl. Second Rep. at 10–11.)

HCPS has identified as objectionable conversations with other employees of Mr. Strother's firm (*e.g.*, Mr. Manos), witnesses in the case (*e.g.*, Jennifer Wood), and other similar individuals. (Def. Second Obj. at 6–7.)

Several entries, however, do involve discussions with outside legal consultants (Troutman Sanders and C. Simchick). Almost all of these time entries involve "lumping" of several activities and indecipherably vague time entries. Therefore, any appropriate reduction for conversations with outside consultants would, to a significant degree, overlap with the above-mentioned reductions for lumping and vague time records. Any significant amount of unrecoverable time spent consulting with experts, therefore, will be accounted for in the 10% reduction already imposed for impermissible lumping and vague time records.

The number of hours reasonably expended also must be assessed in light of the relevant *Johnson* factors. *Johnson* factor 1 requires assessment of the time and labor reasonably required. The Court, based on familiarity with the case, is satisfied that the number of hours claimed, less the time excluded for the reasons cited above, is reasonable. This was a fact-intensive case and those facts presented some legal complication. And, as explained later, HCPS vigorously defended the case, thereby contributing to the number of hours spent by the Plaintiffs' counsel. The time claimed by Plaintiffs' counsel, as reduced, is quite reasonable given the Court's own experience with this case.

The second *Johnson* factor requires assessment of the novelty and difficulty of the questions posed by the action. Although the basic components of IDEA law in this case were not novel in and of themselves, the Defendant made several novel

arguments. For instance, in the initial litigation before the Court, HCPS raised a constitutional issue and several statutory arguments that were novel. Furthermore, the issues on and after appeal, while not necessarily novel, were subtle and complex applications of the IDEA requirements for deference to state hearing officers' opinions and their relation to the merits of the case. These issues substantially increased the time devoted to briefing and argument and thereby increased the fees necessarily incurred by Plaintiffs.

The eighth *Johnson* factor directs the Court to consider the amount in controversy and the results obtained. The Supreme Court has stated that the "degree of success obtained" is "the most critical factor" in determining the reasonableness of the fee award. *Farrar v. Hobby*, 506 U.S. 103, 114, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992) (citation omitted). Here, the Plaintiffs were ultimately completely successful, notwithstanding the temporary setback during the appeals process. Even though the Complaint contained seven counts, each went only to the single question of whether the 2005 IEP met the requirements of IDEA; and because the Court determined that the IEP did not comply with IDEA, the Plaintiffs were successful on what was all along their lone claim. Indeed, the Plaintiffs effectively prevailed twice on the same facts. While the damages recovered as a result may not be large, the attorney's fees claimed need not be strictly proportionate to the amount of damages. *See City of Riverside v. Rivera*, 477 U.S. 561, 574, 106 S.Ct. 2686, 91 L.Ed.2d 466 (1986).

In sum, after considering the Defendant's objections and the *Johnson* factors relevant to rate and time, the hours claimed by Plaintiffs, when reduced as required herein, are reasonable in amount. When adjusted with the reductions and 10% decrease outlined above, the total number of hours compensated will be 560.34 hours of partner time, 642.06 hours of associate time, and 213.21 hours of paralegal time.

### 3. The Lodestar

The lodestar figure in this case is derived by multiplying the 560.34 hours devoted by Mr. Strother by $300 per hour, the 642.06 hours spent by the associates by $190 per hour, and the 213.21 hours by paralegal assistants by $80 per hour and adding them. That calculation produces a lodestar figure of $307,150.20 for *JP I, JP II* and *JP III*.

### 4. The Other *Johnson* Factors

The lodestar figure may be increased or decreased by application of the other *Johnson* factors. *See Robinson*, 560 F.3d at 244–45. The third *Johnson* factor is the level of skill required to perform the legal service properly. As explained previously, the principal skill involved was development and presentation of the case and the ability to dislodge the HCPS witnesses from conclusory assertions that did not square with their own records. Those tasks necessitate an understanding of how to try a complex factual case effectively. Mr. Strother and his team did a creditable job.

The fourth *Johnson* factor, preclusion of other employment is described in Mr. Strother's affidavit wherein he states that the inability of JP's parents to pay even the reduced rate "has dramatically curtailed the [quite small] law firm's ability to take on new clients during the past three years." (Strother Aff. ¶ 17.) However, the affidavit does not explain how that is the case. Therefore, the factor cannot be applied in this case.

The fifth *Johnson* factor is the customary fee. In this case, that factor came into play in assessing the reasonableness of the

hourly rate and the prevailing rate in the community.

The sixth *Johnson* factor is whether the fee is fixed or contingent. The fee here contains both elements. The retainer agreement called for a fixed hourly rate of $165, but also provided for a greater fee if the representation was successful. Further, as the litigation continued, JP's parents became unable to satisfy the fees called for by the retainer in full and later could not pay at all. Nonetheless, the firm continued the representation. Clearly, that placed a fiscal burden on the firm.

The seventh *Johnson* factor was at play at the initial stage of the administrative hearing when Mr. Strother took over for another lawyer. Thereafter, this factor was not applicable and there is no way to assess the impact of the early time limitations on the reasonableness of the requested fee.

The eighth *Johnson* factor is the amount involved and the results obtained. At stake was the cost of educating JP for one year, a total of approximately $33,000. The result obtained was complete success in securing the damages permitted by law. The requested fee is more than ten times the award. However, that must be assessed in perspective of two rather unusual factors.

First, before this case, the parents had been involved in the 2003 Dispute with HCPS and had settled it. As part of the settlement, they secured an agreement from HCPS that the 2004 IEP would contain certain components which had been helpful in educating JP at Spiritos. (*See* Mem. Op. at 6–7.) However, HCPS did not live up to its obligations. (*Id.*) Thus, this litigation took on even greater importance.

Second, HCPS mounted an exceedingly aggressive defense, contesting almost every point. As noted in *Saleh,* a litigant may choose to defend a case in this fashion and to pay its counsel for so doing. *See* 95 F.Supp.2d at 560–61, 570. However, if that litigant loses the case and it is prosecuted under a fee-shifting statute, the litigant must be prepared to pay for the plaintiff's reasonable and necessary response to the aggressive defense.

The 9th *Johnson* factor has been addressed in assessing HCPS' arguments respecting a reasonable hourly rate. It need not be further discussed.

The 10th *Johnson* factor is not present in the traditional way in that the specific case is not an unpopular one. However, the fact that few lawyers are willing to undertake these IDEA cases is documented in this record and that illustrates that IDEA cases as a genre are not desirable ones for lawyers to pursue.

The clients usually cannot afford to pay substantial fees. And, where, as here, the school system fights tooth and nail every step of the way, the lawyer's resources are tied up for protracted periods of time. Thus, in a very real and practical way,[12] IDEA cases can be considered as encompassed within the 10th *Johnson* factor, as a reason supporting a substantial fee.

The 11th *Johnson* factor—the length and nature of the professional relationship—is not involved here.

The 12th factor is awards in similar cases. The record contains reference to an award in a case in this Court's Norfolk/Newport News Division.

Considering the lodestar calculation in perspective of the other *Johnson* factors, there is no basis for increasing or decreas-

---

12. This case illustrates how a lawyer's time can be ensnared in a protracted case and go uncompensated for years.

ing the lodestar figure. However, it is fair to say that application of the other *Johnson* factors support, as reasonable, an award of the magnitude represented by the lodestar amount.

Plaintiffs' counsel accepted, under somewhat difficult circumstances, a representation in mid-course at the administrative level. Because he understood special education law and the jargon of special education, and the ins and outs of the educational system, he was able to present effectively a case that demonstrated quite convincingly how wrong the school board's decisions had been about the IEP for JP. To do this, he had to piece together detailed data from school records to show that the implementation of the IEP in fact had caused JP's education to regress rather to progress. He confirmed this evidentiary showing by the use of knowledgeable experts. In sum, the Plaintiffs were afforded a quality representation.

To allow the parents access to the limited resource base that is the segment of the bar which provides representation in IDEA cases, the lawyer charged the parents reduced fees, fees well below the community rate. The firm thereafter carried the clients when, because of the protracted litigation, they could no longer pay even the reduced rates.

In short, Mr. Strother did what Congress expected lawyers to do: give quality professional service to those who could not afford to pay fully for such service; and he prevailed. To do so, he had to overcome fierce opposition from HCPS. To provide an incentive to lawyers to take worthy cases and pursue them to a successful conclusion, even at considerable interim sacrifice, Congress provided for recompense based on the prevailing community rate for the kind and quality of service furnished.

**D. The Alleged Windfall**

 HCPS' also argues that awarding attorneys' fees in the amount of $307,150.20 to the Plaintiffs would constitute an impermissible windfall. (Def. First Obj. at 12.) This argument is primarily based on the Fourth Circuit's decision in *Trimper*. *Trimper* involved a civil rights claim concerning a leafleting ordinance enacted by the city; upon prevailing, the plaintiff was awarded $100 and costs. 58 F.3d at 70. The district court awarded the plaintiffs $5,260.24 in attorneys' fees— much less than the $31,265.48 requested. *Id.* at 72. The Fourth Circuit, in upholding the award, noted that the underlying purpose of fee-shifting statutes "is to ensure effective access to the judicial process for persons with civil rights grievances without simultaneously producing windfalls to the attorneys." *Id.* at 73. Based on this statement, HCPS argues that, because the Plaintiffs' awarded fees are greater than those actually charged, the award would constitute an impermissible windfall. (Def. First Mem. at 12–13.)

HCPS' contention is undercut, however, by the Fourth Circuit's explanation in *Trimper* that a correctly-calculated lodestar fee is "presumed to be fully compensatory without producing a windfall." *Trimper*, 58 F.3d at 74 (internal quotations omitted). This conclusion is readily apparent because a correctly-calculated lodestar fee will compensate the attorneys for the amount and quality of the services rendered, and fair compensation is the antithesis of a windfall. *See id.* Using the same analysis, the Supreme Court and other Courts of Appeal also have held that, in general, a correctly-calculated lodestar award does not create windfall for the plaintiff's attorneys. *See, e.g., Blanchard v. Bergeron,* 489 U.S. 87, 96, 109 S.Ct. 939, 103 L.Ed.2d 67 (1989); *Planned Parenthood of Cent. New Jersey v. Attorney Gen-*

*eral of State of New Jersey,* 297 F.3d 253, 265 n. 5 (3d Cir.2002); *Walker v. Bain,* 257 F.3d 660, 677–78 (6th Cir.2001).

Furthermore, the fees awarded in this case do not reward the Plaintiffs' counsel for work not done and, in fact, for various reasons discussed above, many billable hours were excluded from the calculation of the award. *See United States v. Holland,* 48 F.Supp.2d 571, 575 n. 3 (E.D.Va. 1999) ("The award to [the plaintiffs] is hardly a windfall as it represents substantially less than the fees and expenses requested and no compensation for the seven years of investigation and prosecution which preceded the acquittal is permitted."). For these reasons, HCPS' contention that an award of attorneys' fees in the amount of $307,150.20 represents a windfall to the Plaintiffs' attorneys lacks merit.

HCPS makes the related argument that an award of this amount might have a negative effect on HCPS itself. (Def. First Mem. at 7.) This argument is based on a comment at oral argument on appeal in which one of the judges said:

But on the other side, we also have School Boards who are strapped for money, that can barely get enough every year from a legislature, from whatever source they can get the money. And if we have every one of the special education students going through and spending a quarter of a million dollars individually on litigation, we're going to bankrupt the educational system. And I don't think that was the purpose either as a matter of policy.

(December 6, 2007 Arg. Tr. (hereinafter "Arg. Tr.") at 9–10.)

The Supreme Court has considered the financial burden placed on school districts by the IDEA. *See Florence County Sch. Dist. v. Carter,* 510 U.S. 7, 15–16, 114 S.Ct. 361, 126 L.Ed.2d 284 (1993). In *Carter,* the school district claimed that allowing reimbursement for public school place-

ments would place an unreasonable burden on schools' finances. *Id.* at 15, 114 S.Ct. 361. In response to this argument, the Supreme Court observed:

There is no doubt that Congress has imposed a significant financial burden on States and school districts that participate in IDEA. Yet public educational authorities who want to avoid reimbursing parents for the private education of a disabled child can do one of two things: give the child a free appropriate public education in a public setting, or place the child in an appropriate private setting of the State's choice. This is IDEA's mandate, and school officials who conform to it need not worry about reimbursement claims.

*Id.* This is not a case such as *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy,* wherein the school could reasonably claim that it lacked notice from the statute that it might be required to pay a certain expense based on its violation of the IDEA. *See* 548 U.S. at 297–300, 126 S.Ct. 2455; *see also Mr. & Mrs. D. v. Southington Bd. of Educ.,* 119 F.Supp.2d 105, 113 n. 2 (D.Conn.2000) ("[A] predicate to [the rule in *Carter*] is that the school district be given ample opportunity, through the review provisions of the IDEA, to make any changes that may be warranted, which was not done in this case.").

Indeed, many courts, including the Fourth Circuit, have recognized that financial burden is not a defense that militates against the substantial awards provided for by the IDEA. *See, e.g., Deal v. Hamilton County Bd. of Educ.,* 392 F.3d 840, 864–865 (6th Cir.2004) (financial burden does not overweigh the meaningful benefit standard); *Bucks County Dept. of Mental Health/Mental Retardation v. Pennsylvania,* 379 F.3d 61, 75 (3d Cir.2004) (financial burden does not overweigh right to reimbursement for expenses related to a pri-

vate trained service provider); *Knable ex rel. Knable v. Bexley City School Dist.*, 238 F.3d 755, 770–71 (6th Cir.2001) (financial burden does not overweigh right to reimbursement for private school placement); *Gadsby by Gadsby v. Grasmick*, 109 F.3d 940, 951 (4th Cir.1997) (same); *N.G. v. District of Columbia*, 556 F.Supp.2d 11, 39 (D.D.C.2008) (same); *Bd. of Educ. of Pawling Cent. Sch. Dist. v. Schutz*, 137 F.Supp.2d 83, 92 (N.D.N.Y.2001) (financial burden does not overweigh right to injunctive relief).

 In sum, it is clear that the Supreme Court has provided a clear answer to HCPS' contention that the burden placed on it by attorneys' fees indicates that an award of those fees is inappropriate: school districts assume the risk of substantial-but-reasonable awards when they violate the IDEA. *See Carter*, 510 U.S. at 15, 114 S.Ct. 361. HCPS' argument is further undercut by its own vigorous defense throughout the course of this litigation. *See Saleh*, 95 F.Supp.2d at 560–61, 570 (explaining that a defendant who mounts a vigorous defense will be responsible for the costs incurred by a prevailing plaintiff in meeting that defense). In a very real sense, therefore, the size of the attorneys' fees award in this case is attributable, in significant part, to the conduct of HCPS in violating the IDEA and then engaging in an aggressive defense. Hence, reducing the size of the attorneys' fee award because of the financial burden placed on HCPS certainly is not appropriate on the facts of this case if, indeed, it ever would be appropriate to do so.

Finally, it is the office of Congress, not the Courts, to establish policy. The Court certainly is neither unaware of, nor insensitive to, the burden that IDEA places on the resources of school systems. But, the consequence of accepting federal funds under IDEA is compliance with the duties imposed by the statute and the attendant fiscal responsibility for failing to comply, one of which is the payment of fees to a prevailing plaintiff. If Congress should conclude that compensating prevailing plaintiffs by using the statutory mode specified by IDEA presents an undue burden on school systems, then Congress can change the mode for determining attorneys' fees. The Court cannot.

### III. Costs

Under IDEA, 20 U.S.C. § 1415(i)(3)(B), the Plaintiffs also request $8,369.69 for costs associated with this litigation. (Pl. First Pet. at I.[13]) Those costs include photocopying, facsimiles, postage, parking, travel, and service and filing fees. (Pl. First Pet. at Exs. B, C; Pl. Second Pet. at Exs. A–F.) HCPS raises no objection to these expenses. Therefore, the Plaintiffs will be awarded $8,369.69 for costs associated with this litigation.

### CONCLUSION

For the foregoing reasons, Plaintiffs' Petition for Attorney Fees and Expenses Exclusive of Costs for Education at Dominion School for *JP I* and *JP III* (Docket No. 113), the Plaintiffs' Petition for Attorney Fees and Expenses Associated with United States Court of Appeals for the Fourth Circuit (Docket Number 111), and the Plaintiff's Statement of Costs of Educating JP at the Dominion School during the 2005–2006 School Year (Docket Number 110) are granted and the Plaintiffs will be awarded $33,187.90 in damages, $307,150.20 in attorneys' fees, and $8,369.69 in litigation expenses for a total judgment in the amount of $348,707.79.

---

**13.** The Plaintiffs have not renewed their requests for expert costs that were litigated in the first trial on this issue.

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record.

It is so ORDERED.