**Commonwealth v. Hawkins**

C.P. of Lehigh County, nos. CR-4684, 4799, 5242-2009.

*Charles Gallagher III, chief deputy district attorney,* and *Jeffrey Dimmig, deputy district attorney,* for Commonwealth.

*Allan L. Sodomsky* and *Jay M. Nigrini,* for defendant.

STEINBERG, *J.,* September 16, 2010—The defendant, Daniel Hawkins, is charged[1] with criminal homicide[2] in the shooting death of Paul Burrier Jr. on Septem-

---

1. Lehigh County no. CR-4684-2009.
2. 18 Pa.C.S. §2501(a).

ber 20, 2009. He is also charged[3] with possession with intent to deliver a controlled substance,[4] manufacture a controlled substance,[5] possession of a controlled substances[6] (3 counts), and possession of drug paraphernalia.[7] The drug charges relate to the discovery of marijuana, cocaine and prescription medication in the defendant's residence, as well as marijuana located in a garage and in the woods near the residence. Finally, he is charged[8] with endangering the welfare of a child[9] (4 counts) by growing marijuana in his residence where four minor children resided, the youngest of which was 1 year old.

Omnibus pretrial motions were filed on behalf of the defendant, and hearings on those motions were held on March 16, 2010, May 10, 2010, June 8, 2010, and June 14, 2010. This opinion will address the "motion to suppress statements" which is limited to the homicide charge, the "motion to sever cases and oppose Commonwealth's notice of consolidation," which seeks a severance of the homicide charge from the remaining drug and child endangerment charges, and a "motion to suppress physical evidence," contesting the searches

---

3. Lehigh County no. CR-4799-2009. A charge of delivery of a controlled substance was withdrawn by agreement on March 16, 2010. Additionally, one count of persons not to possess, use, manufacture, control, sell or transfer firearms was withdrawn by agreement on May 10, 2010, and six additional counts of that charge were withdrawn on June 8, 2010.
4. 35 P.S. §780-113(a)(30).
5. 35 P.S. §780-113(a)(30).
6. 35 P.S. §780-113(a)(16).
7. 35 P.S. §780-113(a)(32).
8. Lehigh County no. CR-5242-2009.
9. 18 Pa.C.S. §4304(a).

which led to the discovery of the controlled substances and drug paraphernalia.[10]

During the hearing held on March 16, 2010, the Commonwealth presented the testimony of Officer Arthur Williams of the Lower Milford Township Police Department, and Troopers Gregory O'Neill and Thomas Durilla II of the Pennsylvania State Police. Officer Williams responded to the report of a shooting at 4657 East Mill Hill Road, Greenville, in the early evening of September 20, 2009. Upon his arrival at 7:07 p.m., he was flagged down by an individual who was pointing down a hill and saying "he's down there, he's down there."[11] Officer Williams asked if the person who had the gun was still on the premises, and he was told that the person with the gun was behind the house. Officer Williams proceeded down the driveway in his police vehicle, and after approximately 50 yards, the defendant "started running towards me with his hands up, waiving his hands."[12] The defendant, in response to Officer Williams inquiry, "what's going on," responded, "I shot him but didn't mean to kill him. I shot him. I didn't mean to."[13] Officer Williams asked the defendant if he still was in possession of the gun, and the defendant said that he was not. The defendant was then handcuffed and placed in the back of the patrol vehicle.

Officer Williams proceeded an additional 100 yards down the driveway in his patrol vehicle and observed. two females performing CPR on the victim. The victim, Mr. Burrier, was on the ground approximately six to

---

11. N.T. 3/16/10, p. 15.

12. *Id.*

13. *Id.*

seven feet from the front door of the residence. An ambulance then arrived and medical personnel began administering aid to the victim. Officer Williams asked Theresa Hawkins, the defendant's wife, about the gun that was used in the shooting, and was told that it was on her kitchen counter.[14] Ms. Hawkins opened the door to her home, and with Officer Williams, they entered the residence. She pointed to a revolver on the kitchen counter, and told Officer Williams, "there is the gun there."[15] Officer Williams picked up the gun and put it in his pocket.

Later in the evening, Officer Williams escorted Ms. Hawkins back into the home to gather personal belongings to stay at a relative's home for the night. Prior to doing so, he asked Ms. Hawkins if there were any weapons inside the home, and when told that there were, he requested permission to accompany her. Ms. Hawkins consented, and as they entered the master bedroom, Ms. Hawkins lifted the mattress and pointed to a handgun. Officer Williams retrieved the weapon, and also observed a "computer monitor [with] what appeared to be a digital video of the front door,"[16] which is where the entire incident unfolded.

Trooper O'Neill was assigned to assist with the shooting investigation and arrived at 8:40 p.m. He met with Ms. Hawkins and she willingly signed a "waiver of rights and consent to search" form, permitting the investigators to enter the residence and secure "cell phones; video/

14. N.T. 3/16/10, p. 18.
15. *Id.*
16. N.T. 3/16/10, p. 20.

audio recording instrument(s)."[17] The form was signed at 10:36 p.m. and shortly thereafter, the investigators entered the home and observed the video equipment. Due to the nature of the equipment, a decision was made not to seize it, but to request the assistance from someone with more technical training. It was also decided to secure a search warrant.

Trooper Durilla prepared, secured, and executed the search warrants for the residence and other property located at 4657 East Mill Hill Road. The initial search warrant[18] (the "first search warrant"), resulted in the collection of four firearms, firearm cases, ammunition, three "scanning electron microscopy kits," cell phones, a hat, sunglasses, a towel, and the defendant's wallet.[19] Also, during the execution of this search warrant, Trooper Durilla detected an odor of marijuana in the residence and also observed contraband inside a room of the residence.[20] He testified that he also could smell marijuana near the detached garage, could see light emanating from around the garage door, and could hear exhaust fans.[21] This indicated to Trooper Durilla that there was probably a marijuana growing operation on the property. Based upon these observations, Trooper Durilla prepared a second search warrant seeking to search "the residence, curtilage, vehicles, compartments, safes, strongholds, garages, outbuildings and any other containers therein which could be reasonably construed to contain items

17. Commonwealth exhibit 1.
18. Commonwealth exhibit 2.
19. *Id.* (receipt/inventory of seized property).
20. N.T. 3/16/10, pp. 60-61, 68.
21. N.T. 3/16/10, pp. 61, 74.

described within the attachments."[22] The items to be searched for and seized were identified as follows:

(1) Books, records, receipts, notes, ledgers, papers, and other items relating to the transportation, ordering, purchase, and/or distribution of controlled substances, and/or relating to proceeds derived from the trafficking in controlled substances.

(2) Papers, tickets, notes, receipts, and other items relating to domestic and/or international travel;

(3) Address and/or telephone books, (written or typed by hand as opposed to printed commercially), realties indices and any other papers reflecting names, addresses, telephone numbers, pager numbers, fax numbers, and/or telex numbers of co-conspirators, sources of supply, customers, financial institutions, and any other individuals or businesses with whom a financial relationship exists;

(4) Computers, computer diskettes and any and all information stored therein relating to the transportation, ordering, purchasing and/or distribution of controlled substances and/or relating to proceeds derived from trafficking in controlled substances;

(5) Telephones, cellular telephones, paging devices and any and all information stored therein relating to the transportation, ordering, purchasing and/or distribution of controlled substances and/or relating to proceeds derived from trafficking in controlled substances;

(6) Address books, telephone books, electronic organizers, pocket data directories, calendars and/or any and

22. Commonwealth's exhibit 3.

all records identifying names, addresses, meetings, telephone numbers, pager numbers, fax numbers, financial institutions and/or any other person or business with whom a relationship exists relating to the transportation, ordering, purchasing, and/or distribution of controlled substances and/or relating to the proceeds derived from trafficking in controlled substances;

(7) All electronic communication devices capable of storing electronic communications, electronic storage, all devices capable of any temporary, intermediate storage of a wire or electronic communication incidental to the electronic transmission thereof, to wit: numerical pagers, numerical beepers pagers and/or beepers with electronic voice mail, laptop computers, telephone voice mail, desk top computer systems, electronic calendars, cellular telephones, electronic roll-a-decks, electronic personal organizers, and all other electronic items that store electronic communication, to wit: names and phone numbers and messages of individuals, and/or electronic messages;

(8) Indicia of rental and/or ownership of vehicles described herein, including but not limited to vehicle registration documents, rental, purchase or lease agreements and keys; as well as documents relative to the identity and residency of the operator and occupants of the vehicle described therein;

(9) Indicia of occupancy, residency, rental and/or ownership of the premises described herein, including but not limited to utility and telephone bills, cancelled envelopes, rental purchases, or lease agreements, and keys;

(10) Firearms and ammunition, including but limited to handguns, pistols, revolvers, rifles, shotguns, machine guns, and other weapons, and any record or receipts pertaining to firearms and ammunition;

(11) Cocaine, heroin, marijuana, methamphetamine and any and all other controlled substances, scales for weighting of controlled substances, any and all drug paraphernalia, including packets of materials, and any and all other drug paraphernalia used for/in manufacturing, packaging, and/or ingesting of controlled substances;

(12) Photographs, including still photos, negative slides, videotapes, film, undeveloped film and the contents therein, in particular photographs of co-conspirators, of assets and or controlled substances, persons with whom a relationship exists relating to the transportation, ordering, purchasing and/or distribution of controlled substances and/or relating to proceeds derived from the trafficking in controlled substances;

(13) Any United States or foreign currency, financial instruments, precious metals, jewelry, automobile titles and other items of value which are proceeds of drug transactions and/or evidence of financial transactions relating to obtaining, transferring, secreting and/or spending large sums of money acquired from the trafficking in controlled substances;

(14) Any and all other items identified in the affidavit of probable cause relating to the transportation, ordering, purchasing and/or distribution of controlled substances and/or relating to the proceeds derived from trafficking in controlled substances;

(15) Any and all items associated with the cultivation, maintenance or harvesting of plants.[23]

During the execution of the second search warrant, the police collected items identified as 1—116 including, marijuana and marijuana seeds in various types of containers, suspected khat in several types of containers, suspected cocaine, prescription drugs, unknown pills, equipment cleaner, large Ziploc bags, metal grinders, razor blades, scissors, digital scales, rolling papers, scissors, cellular telephones, inositol powder, fans, timers, grow lights, seedling heat mats, roach clip stands, glass pipes, books and magazines on the subject of marijuana growing, invoices and receipts for equipment for marijuana growing, a computer and laptop, guns, ammunition, U.S. currency in the amount of $14,837, and other miscellaneous items.[24]

The defendant was eventually transported to the Lower Milford Police Department. Prior to doing so, he remained in the custody of Corporal Scott Ohl. During that period of time, the defendant asked about the condition of the victim, and stated several times, "please, please, don't let him die," and "I can't believe I shot him." [25]

Shortly before midnight, Trooper O'Neill proceeded to the Lower Milford Police Department in an attempt to interview the defendant. He testified at the hearing

23. *Id.*

24. *Id.* (receipt/inventory of seized property).

25. N.T. 5/10/10, pp. 106-107. The parties agreed to rely on the homicide investigation action report (Commonwealth exhibit 6) for the content of the defendant's statements in the presence of Corporal Ohl.

held on May 10, 2010, that he began the interview by securing biographical information from the defendant. Specifically, he asked for the defendant's name, date of birth, occupation, and other information unrelated to the shooting. The defendant was also asked if he was injured or had been using intoxicants, both of which the defendant denied. At that point, Trooper O'Neill turned his questioning towards the shooting. Before he did so, he told the defendant that he needed to advise him of his *Miranda* warnings. The defendant explained that he "understood his rights, and that he was familiar with what he can or can't do."[26] With that, he told Trooper O'Neill and Trooper Kirk Vanim, who was also present, that he "just wants to get back to his kids," and that the incident is "all on the cameras."[27] Trooper O'Neill, again, informed the defendant that he needed to provide him with *Miranda* warnings. It was at this point that the defendant commented that "he understands that and that he wants to speak with a lawyer."[28] Trooper O'Neill ended his questioning, but told the defendant that after he gets a lawyer, if he chooses to do so, he could give a statement.[29] The defendant then stated, "Paul being a fighter . . . he was hit by Paul without any warning . . . [and] that he asked Paul to leave and Mr. Hawkins said that Paul told him that he had to make him leave."[30] Following some additional innocuous statements, the defendant, again, requested an attorney.[31] The entire interaction between Trooper O'Neill ended after approximately 23 minutes.

26. N.T. 5/10/10, p. 12.
27. N.T. 5/10/10, p. 15.
28. N.T. 5/10/10, p. 16.
29. *Id.*
30. *Id.*
31. N.T. 5/10/10, p. 17.

The defendant then began to complain of head pain. He was transported by ambulance to the hospital for treatment and then was returned to the Fogelsville State Police Barracks. While at the barracks, Trooper O'Neill was advised that the victim had passed away. He conveyed that information to the defendant at approximately 3 a.m. or 4 a.m. The defendant became upset and exclaimed, "I killed somebody . . . I killed somebody. I can't believe it."[32] The testimony of Trooper O'Neill reflects what happened next:

"He went on to state that the gun was in his pocket. I recalled he motioned with his hand; he patted his leg in the pocket area—the front pocket area. He stated that he didn't even pull it out until he hit him from behind. He was—I believe he was indicated that Paul hit him from behind.

"I asked him if he wanted to speak about the incident and that if he wanted to we would have to again do the whole *Miranda* thing. He just kept on speaking. He commented that it was self-defense.

"He stated, "I mean, he took it upon himself to come to my house." "I told him to leave, and he said make me." "I shot Paul."

"That—I'm sorry, that is when I asked him if he would like to talk or answer questions about the incident. And he said he wanted a lawyer, and—immediately after—after that. And he was all distraught, he said, "I shot him—I shot him, I'm so sorry." He was very, you know, upset during this time."[33]

---

32. N.T. 5/10/10, p. 20.
33. *Id.*

During the hearing on May 10, 2010, Ms. Odessa Connolly, who was the victim's fiancée and is a cousin of the defendant, recounted the events leading up to the shooting. She and the victim owed the defendant money, and the defendant wanted to be paid. Before the shooting Ms. Connolly returned a telephone call from the defendant, who expressed his unhappiness about the unpaid money. He told her that, "family doesn't screw over family."[34] The conversation then turned to the construction work the victim failed to finish on the defendant's property, namely, drywall in a room attached to the garage, and painting in a child's bedroom.[35] Ms. Connolly was visibly upset from the conversation with the defendant, which was apparent to the victim. The victim then called the defendant and their conversation ended with the victim saying, "you're going to say that to my face? . . . Are you going to come here?"[36] The victim then "stormed" out of his house.[37] The defendant subsequently called Ms. Connolly and she told him that the victim was on his way to the defendant's home.[38] Following the shooting, the defendant called Ms. Connolly and screamed, "I'm sorry, I'm sorry, I'm sorry."[39]

The testimony from the preliminary hearing revealed that on the night of the shooting, the defendant had his family, as well as Michael Church, who is the defendant's cousin, Ashley Denny, Mr. Church's girlfriend, and Ms. Denny's daughter at his home for dinner. While they

34. N.T. 5/10/10, pp. 88, 93.
35. N.T. 5/10/10, pp. 90-93.
36. N.T. 5/10/10, p. 96.
37. *Id.*
38. N.T. 5/10/10, p. 100.
39. N.T. 5/10/10, p. 101.

were gathered at the defendant's home, the victim arrived in a very angry state.[40] The defendant met the victim outside the front door.[41] Mr. Church stated that he saw the victim and the defendant arguing, and then observed the victim begin to "start hitting Daniel and just punching him.[42] Mr. Church saw the victim hit the defendant five or six times, and never saw the defendant hit the victim.[43] Upon seeing this, Mr. Church went to the front door and asked, "What the F is going on here?"[44] At that point, the defendant began moving toward Mr. Church and "fleeing from Paul into the doorway of the house."[45] The defendant appeared dazed and in pain from the punches.[46] The defendant then turned around and pointed a gun at the victim and told the victim "to pay him his money and to get off of his property and leave."[47] The victim did not back off, and instead, became incensed at the sight of the gun and came at the defendant.[48] The defendant stated, "mother F-er and pulled the trigger and shot him."[49] The victim was approximately four feet from the defendant when he was shot, and he immediately fell to the ground.[50] The defendant instantly stated, "I shot him, oh, my God, I'm going to jail."[51] Mr. Church testified that he called 9-1-1 for assistance.[52]

---

40. Preliminary hearing (P.H.) 11/12/09, p. 27.
41. P.H. at 11.
42. P.H. at 12.
43. P.H. at 30.
44. P.H. at 12.
45. *Id.*
46. P.H. at 31.
47. P.H. at 12-13.
48. P.H. at 32.
49. P.H. at 13.
50. P.H. at 13-14.
51. P.H. at 14.
52. *Id.*

## DISCUSSION

### A. *Motion To Suppress Statements in Case CR-4684-2009*

The defense seeks to suppress the various statements made by the defendant in the presence of Officer Williams, Corporal Ohl, Trooper O'Neill, and Trooper Vanim. The defendant argues that "[t]he admission of [his] statements to the police would violate [his] rights under the Fourth [*sic*-Fifth] and Fourteenth Amendments of the United States Constitution and Article 1, Section 8 of the Pennsylvania Constitution."[53] For the reasons discussed below, these claims are denied.

*Miranda* rights are only required prior to a custodial interrogation. *Commonwealth v. Housman,* 986 A.2d 822, 839 (Pa. 2009); *Commonwealth v. Smith,* 575 Pa. 203, 224, 836 A.2d 5, 18 (2003). "Custodial interrogation is 'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of [his] freedom of action in any significant way.'" *Commonwealth v. Gonzalez,* 979 A.2d 879, 887-88 (Pa. Super. 2009), quoting *Miranda v. Arizona,* 384 U.S. 436, 444 (1966). In that regard, not every statement made by an individual during a police encounter constitutes an interrogation. *Commonwealth v. Williams,* 941 A.2d 14, 30 (Pa. Super. 2008). Additionally, volunteered or spontaneous utterances by an individual are admissible without the administration of *Miranda* warnings. *Id.* See also, *Commonwealth v. Bracey,* 501 Pa. 356, 461 A.2d 775 (1983); *Commonwealth v. Scarborough,* 491 Pa. 300,

---

53. Omnibus pretrial motion, ¶37.

421 A.2d 147 (1980); *Commonwealth v. Cornelius,* 856 A.2d 62, 75 (Pa. Super. 2004). "When a defendant gives a statement without police interrogation, we consider the statement to be 'volunteered' and not subject to suppression . . . . Interrogation is police conduct 'calculated to, expected to, or likely to evoke admission.'" *Commonwealth v. Brown,* 551 Pa. 465, 481, 711 A.2d 444, 451 (1998) (citations omitted); *Commonwealth v. Bess,* 789 A.2d 757, 762 (Pa. Super. 2000). See also, *Rhode Island v. Innis,* 446 U.S. 291, 301-302 (1980) ("[s]ince the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of the police officers that they should have known were reasonably likely to elicit an incriminating response"). It was explained by the court in *Commonwealth v. Sepulveda,* 579 Pa. 217, 240, 855 A.2d 783, 796-797 (2004) (Castillo concurring), that suppression of a statement in a custodial setting not required where the suspect "spontaneously 'blurts out' the statement, . . . or makes an incriminating statement in the course of 'small talk' with authorities, . . . or is merely responding to biographical questioning, . . . or makes an incriminating statement after voluntarily initiating communication with the authorities, . . . or makes an incriminating statement in response to a declaration, rather than an inquiry, on the part of the authorities." (internal citations omitted) See also, *State v. Rheaume,* 853 A.2d 1259, 1266-67 (Vt. 2004). (collecting cases)

The defendant's first argument is with respect to his statements to Officer Williams prior to being taken into custody. As Officer Williams drove up the driveway to

the defendant's residence, the defendant ran toward the police vehicle and stated, "I shot him. I didn't mean to kill him." These statements were spontaneously made, without any comment by Officer Williams with the exception of "what's going on." The defendant was not in custody and this inquiry was investigatory, not accusatory. *Williams*, 941 A.2d at 31-33. See also, *Miranda* 384 U.S. at 477 ("General on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process is not affected by our holding."). Officer Williams' inquiry was also not calculated to elicit an incriminating response. As a result, there was no custodial interrogation and *Miranda* warnings were not required.

The defendant's second argument relates to his statements to Corporal Ohl, which were made as he waited in a police vehicle to be transported to the police station. There is no evidence that Corporal Ohl made any statements to the defendant. The only evidence shows that the conversation between Corporal Ohl and the defendant was entirely one-sided, with the defendant doing all of the talking. The defendant asked several times about the condition of the victim, but Corporal Ohl did not have any information regarding the victim. The defendant also stated several times, "Please, please don't let him die." and "I can't believe I shot him." These comments were unprompted, and hence, were volunteered, and not the product of any custodial interrogation. *Commonwealth v. Ventura*, 975 A.2d 1128, 1136-37 (Pa. Super. 2009).

The defendant's remaining arguments pertain to his statements at the police station to Troopers O'Neill and Vanim. In the beginning of the interview, before attempt-

ing to give the defendant *Miranda* warnings, Trooper O'Neill asked the defendant for biographical information, including information about his family and occupation. Trooper O'Neill also asked if the defendant was injured or under the influence of any substance. *Miranda* warnings are not required prior to biographical and preliminary questions. "Generally speaking, general information such as name, height, weight, residence, occupation, etc. is not the kind of information which requires *Miranda* warnings since it is not information generally considered as part of an interrogation." *Commonwealth v. Jasper,* 526 Pa. 497, 503, 587 A.2d 705, 708-709 (1991). Such questions are "not calculated to, expected to, or likely to elicit an incriminating response, or . . . asked with [the] intent to extract or an expectation of eliciting an incriminating [response]." *Commonwealth v. Davis,* 460 Pa. 37, 40, 331 A.2d 406, 407 (1975), quoting *Commonwealth v. Yount,* 455 Pa. 303, 309, 314 A.2d 242, 246 (1974); *Commonwealth v. Bey,* 294 Pa. Super. 229, 239, 439 A.2d 1175, 1180 (1982). Here, the discussion regarding the defendant's biographical and personal information only took a few minutes. Additionally, Trooper O'Neill testified that when he discussed these matters with the defendant he was not attempting to elicit any information regarding the shooting. Instead, he was solely attempting to develop a rapport with the defendant before beginning the interrogation. Accordingly, the preliminary conversation between the defendant and Troopers O'Neill and Vanim is not suppressible.

Following the preliminary questions, Trooper O'Neill informed the defendant that he needed to read the defendant his *Miranda* warnings before talking about the

shooting incident. At this juncture, the defendant commented that he was familiar with *Miranda* because some of his family members worked at the police department. The defendant then stated, "I just want to get back to my kids. You'll see it in the camera. He hit me from behind. I love him. I love Paul." These comments from the defendant were spontaneous and unprovoked. Trooper O'Neill did not take any action, or make any inquiry that would elicit a statement from the defendant about the shooting or otherwise. For this reason, these statements were volunteered, and are not subject to suppression.

Trooper O'Neill next attempted to redirect the conversation back to the *Miranda* warnings by telling the defendant that he was interested in talking about the shooting, but that he first needed to read the defendant his *Miranda* rights. The defendant stated that he understood and that he wanted to speak to an attorney. Trooper O'Neill informed the defendant that, "In his experience as a criminal investigator that after a person contacts a lawyer, the accused and his lawyer will have an opportunity to speak with each other about the investigation," and then the defendant could choose to give a statement later with the approval of his lawyer. The defendant responded by saying,

"I'm not going to leave. I'm not going anywhere. I know I'm not. I hope Paul is ok, but Paul is a fighter. Paul would just hit you without warning, that's what he did not me. I said Paul, please leave and he said 'make me.' I told Paul I was going to call the cops and then I turned away from him and he clocked me right in front of my kids. I am really hurt emotionally and I am going to need a counselor. I am really hurt and I know that my family will not forgive me. I loved Paul."

The defendant concluded by again stating that he wanted a lawyer, and the interview was ended.

In this instance, following the defendant's invocation of his right to counsel, and without any questioning or encouragement from the troopers, the defendant "blurted out" inculpatory statements about the shooting. Trooper O'Neill, on several occasions, informed the defendant that he needed to give the defendant *Miranda* warnings before discussing the shooting. Despite this, the defendant continued to make incriminating statements. Since the troopers did not use any words or actions they should have known were reasonably likely to elicit an incriminating response, the defendant's statements were volunteered, and there is no constitutional impediment to their use by the Commonwealth.

It is true that "a defendant who requests counsel at any time during a custodial interview 'is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Commonwealth v. Edwards,* 588 Pa. 151, 170, 903 A.2d 1139, 1150 (2006), quoting *Edwards v. Arizona,* 451 U.S. 477, 484-85 (1981). When a defendant invokes his right to counsel, a confession secured afterward will be suppressed unless the defendant not only "[initiated] further communication, exchanges or conversations with the police,' [but also] knowingly and intelligently waived the right to counsel." *Id.,* quoting *Commonwealth v. Hubble,* 509 Pa. 497, 504 A.2d 168, 175 (1986), *cert. denied* 477 U.S. 904 (1986). The Supreme Court in *Edwards v. Arizona, supra,*

"established a second layer of prophylaxis for the *Miranda* right to counsel: once a suspect asserts the right,

not only must the current interrogation cease, but he may not be approached 'until counsel has been made available to him'. . . . If the police do subsequently initiate an encounter in the absence of counsel, . . . the suspect's statements are presumed involuntary and therefore inadmissible as substantive evidence at trial, even where the suspect executes a waiver and his statements would be considered voluntary under traditional standards. This is 'designed to prevent badgering a defendant into waiving his previously asserted *Miranda* [right to counsel] rights . . . .'" *Commonwealth v. Hayes,* 755 A.2d 27, 32-33 (Pa. Super. 2000), quoting *Commonwealth v. Wyatt,* 447 Pa. Super. 393, 399-400, 669 A.2d 954, 956-57 (1995) and *McNeil v. Wisconsin,* 501 U.S. 171, 174-77 (1991).

However, in this case, the defendant was not subject to further interrogation. Once the defendant stated that he wanted to speak to an attorney, the interview was concluded. Trooper O'Neill did not make any further attempts to give the defendant his *Miranda* warnings because any attempt to interview the defendant was at an end. Asking the defendant to consider making a statement after securing counsel was not likely to elicit the response made by the defendant. Therefore, the defendant's right to counsel was not violated. See *Commonwealth v. Martin* 2010 WL 3222018, *7 (Pa. August 17, 2010).

In the early morning hours of September 21, 2009, Trooper O'Neill reinitiated contact with the defendant for the limited purpose of informing the defendant that the victim had died. Upon hearing this news, the defendant became visibly emotional and made incriminating and self-serving statements about self-defense. Trooper

O'Neill asked the defendant if he wished to discuss the incident further, because if so, then he needed to provide the defendant with his *Miranda* warnings. The defendant responded by requesting a lawyer, and then stated, "I shot Paul. I mean he took it upon himself to come to my house. I told him to leave and he said 'make me.'" Trooper O'Neill again asked the defendant if he wanted to speak to him about the shooting, and the defendant again said that he wanted a lawyer. The defendant then stated, "I shot him. I shot him. I am so sorry."

The defense contends that the defendant's incriminating statements[54] after he was advised of the victim's death should be suppressed. Specifically, it is alleged that although the comment about the victim was not "express questioning," it was the "functional equivalent." *Commonwealth v. Gaul,* 590 Pa. 175, 181, 912 A.2d 252, 255 (2006). The "functional equivalent" of an interrogation includes "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.*

In *Rhode Island v. Innis,* 446 U.S. 291 (1980), the defendant was arrested for the shotgun murder of a taxi driver, but the shotgun was not initially recovered. Thereafter, the defendant requested counsel, and while the defendant was being transported by the police, one officer remarked to another that handicapped children at a nearby school might injure themselves if they found the

---

54. An incriminating statement is any response whether inculpatory or exculpatory that the prosecution seeks to introduce at trial. *Commonwealth v. Petrino,* 332 Pa. Super. 13, 29, 480 A.2d 1160, 1168 (1984).

shotgun and shells. The defendant then led the officers to the gun. The Supreme Court considered whether the defendant was subject to "interrogation," as the term was used in *Miranda*. See *Innis,* 446 U.S. at 298. Their analysis concluded that the defendant in *Innis* was not subject to interrogation, but expanded the meaning of "interrogation" to include not only express questioning but also its "functional equivalent." See *id.* at 300. The court stated:

"[T]he *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to object proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation only to words or actions on the part of the police officers that they *should have known* were reasonably likely to elicit an incriminating response."

Here, the defendant, sooner or later, was going to learn about the death of Mr. Burrier from the troopers. He was going to be charged with criminal homicide, and so needed to be made aware that the victim died. "The Supreme Court has indicated that *Innis* does not place the police under a blanket prohibition from informing a suspect about the nature of the crime under investigation or about the evidence relating to the charges brought against him." *Commonwealth v. DeJesus,* 567 Pa. 415, 429, 787 A.2d 394, 402 (2001), abrogated on other grounds, *Commonwealth v. Cousar,* 593 Pa. 204, 928 A.2d 1025 (2007). See also, *Gaul,* at 181, 912 A.2d at 255. Although Trooper O'Neill intended to elicit an incriminating or emotional response with his notification of the victim's death, it was not improper. *Innis* establishes an objective test which focuses on the "suspect's perceptions and not the intent of the police." *Id.* Trooper O'Neill provided information from which the defendant could not be shielded. The defendant's statements may have been a by-product of that information, but an objective analysis does lead to the conclusion that news of the death of the victim was not likely to elicit an incriminating response.[55]

### B. *Motion To Sever Case 4684-2009 From Cases 4799-2009 and 5242-2009*

The decision to sever cases for trial is within the trial court's discretion and is subject to a manifest abuse re-

---

55. Cf: *Gaul, supra.* (Reading the charging documents to the defendant was the functional equivalent of an interrogation); *State v. Wilson,* 181 P.3d 887 (Wash.App. 2008) (Providing defendant notice of victim's death was reasonably likely to elicit an incriminating response).

view, or "prejudice and clear injustice to the defendant." *Commonwealth v. Wholaver,* 989 A.2d 883 (Pa. 2010). Pa.R.C.P. 582(A)(1) permits separate informations to be tried together if:

"(a) the evidence of each of the offenses would be admissible in a separate trial for the other and is capable of separation by the jury so that there is no danger of confusion; or (b) the offenses charged are based on the same act or transaction." Additionally, Pa.R.C.P. 583 permits "separate trials of offenses . . . if it appears that any party may be prejudiced by offenses . . . being tried together."

The Supreme Court has outlined a three-part test to consider:

"[1] whether the evidence of each of the offenses would be admissible in a separate trial for the other; [2] whether such evidence is capable of separation by the jury so as to avoid the danger of confusion; and, if the answers to these inquiries are in the affirmative, [3] whether the defendant will be unduly prejudiced by the consolidation of offenses." *Commonwealth v. Collins,* 550 Pa. 46, 55, 703 A.2d 418, 422 (1997), quoting *Commonwealth v. Lark,* 518 Pa. 290, 302, 543 A.2d 491, 496-97 (1988). See also, *Commonwealth v. Lauro,* 819 A.2d 100, 106-107 (Pa. Super. 2003).

The first part of our analysis is to decide if evidence of each of the offenses would be admissible in a separate trial for the other. *Collins,* at 55, 703 A.2d at 422. Generally, evidence of other criminal acts are not admissible solely to demonstrate the defendant's bad character or his propensity to commit crime. *Id.* However, such evi-

dence may be admissible for other legitimate purposes, including demonstrating:

"(1) motive; (2) intent; (3) absence of mistake or accident; (4) a common scheme, plan or design embracing the commission of two or more crimes so related to each other that proof of one tends to prove the others; or (5) the identity of the person charged with the commission of the crime on trial." *Id.* at 55, 703 A.2d at 422-23.

In addition, evidence of other crimes may be admissible to show the history of the case and form part of the natural development of the facts. *Id.*

In this case, the defendant contends that the criminal homicide charge in case CR-4684-2009 should be severed from the drug distribution and endangerment charges in cases CR-4799-2009 and CR-5242-2009. The defendant argues that the charge of criminal homicide has nothing to do with the drugs that were found on his property. Furthermore, the charges of endangering the welfare of children "are based upon the Commonwealth's theory that the defendant"s children were living in a house where drugs and guns were found."[56] Hence, defense contends that the charge of criminal homicide is unrelated to the other charges, and allowing all of these charges to be heard together by a jury "demonstrates nothing more than the defendant's propensity to commit crimes."[57]

The prejudice that justifies a severance is that which would occur if the evidence tended to convict the defen-

---

56. Omnibus pretrial motion in CR-4684-2009, ¶52.
57. Omnibus pretrial motion in CR-4684-2009, ¶53.

dant only by showing his propensity to commit crimes. *Collins,* at 57, 703 A.2d at 423; see also, *Commonwealth v. Lark,* at 307, 543 A.2d at 499. In the past, three types of prejudice were identified if separate offenses were joined:

"These are: (1) defendant may become embarrassed or confounded in his defense; (2) the jury may use the evidence of one of the crimes charged to infer a criminal disposition on the part of the defendant from which is found his guilt of the other crime or crimes charged; or (3) the jury may cumulate the evidence of the various crimes charged and find guilt, when, if considered separately, it would not so find." *Commonwealth v. Peterson,* 453 Pa. 187, 194, 307 A.2d 264, 267 (1973).

In *Commonwealth v. Grillo,* 917 A.2d 343 (Pa. Super. 2007) (en banc), the defendant was convicted of receiving stolen property, attempted burglary, and related charges. In his direct appeal the defendant argued that it was error not to sever the charges of attempted burglary and receiving stolen property. The court agreed and held the following:

"There does not seem to be any relationship between the RSP and the attempted burglary, except that it may be used to show that if Grillo had proceeds from two burglaries, he is a bad person and more likely to try to commit another burglary. This is precisely why evidence of another crime is considered too prejudicial to be admissible. Evidence of other crimes is generally prohibited by Pa.R.E. 404(b), which provides that such evidence can only be admitted when the probative value outweighs the potential for prejudice. It can be admitted under Pa.R.E. 404(b)(2), but only if it is used to prove motive,

opportunity, intent, preparation, plan, knowledge, identity or absences of mistake or accident. None of those circumstances is present in the instant case.

"There are no real common issues of fact between the RSP and the attempted burglary. The victims are different and the evidence is different. The burglary would be tried without any reference to the stolen items found in the SUV. The RSP, if tried separately, would be tried without any reference as to *why* the police were looking in the SUV. Therefore, there is no need to bring the facts of one crime into the trial of the other. The issues of fact are not common." *Id.* at 345. See also, *Commonwealth v. Stewart,* 325 Pa. Super. 465, 469-70, 473 A.2d 161, 164 (1984); *Commonwealth v. Brown,* 351 Pa. Super. 119, 127, 505 A.2d 295, 299-300 (1986).

The general policy of the law is to "encourage joinder of offenses and consolidation of indictments when judicial economy can thereby be effected, especially when the result will be to avoid the expense and time-consuming duplication of evidence." *Grillo,* 917 A.2d at 347, quoting *Commonwealth v. Patterson,* 519 Pa. 190, 197, 546 A.2d 596, 600 (1988). However, "the interest in judicial economy must be balanced against the need to minimize the prejudice that may be caused to a defendant by consolidation." *Id.*

"The defendant bears the burden of proving that he was prejudiced by the decision not to sever, and he must show real potential for prejudice rather than mere speculation." *Grillo,* 917 A.2d at 347, quoting *Commonwealth v. Rivera,* 565 Pa. 289, 298, 773 A.2d 131, 137 (2001). Here, the prejudice to the defendant is the likelihood that

the jury will infer that the defendant is both a killer, a drug dealer, and a bad father, and, as stated in *Peterson,* "may cumulate the evidence of the various crimes charged . . . ." The only connection. between the homicide and drug offenses is that they both occurred at 4657 East Mill Hill Road. The drugs were not the motivation for the killing. The victim's fiancée, Odessa Connolly, testified that the dispute between the victim and the defendant involved money owed to the defendant by the victim. However, the money was not for drugs, but a loan given by the defendant to the victim and Ms. Connolly, who were "struggling with their bills." The dispute also involved unfinished construction at the defendant's residence by the victim, for which he received an ATV.[58] Aaron Connolly, the defendant's cousin and Ms. Connolly's brother, confirmed that the defendant was upset "about the money [the victim] owed him for doing the room, and the four-wheeler he wanted to take that back." [59] The defendant also had to pay someone else to finish the construction, which was completed approximately three months prior to the shooting.[60] Finally, at the continuation of the severance hearing on June 14, 2010, Michael Church confirmed the information about the four-wheeler and loan, which he said was to help pay the victim's mortgage.

The admission of other criminal acts, as previously explained, is limited to demonstrate (1) motive (2) intent (3) absence of mistake or accident (4) common scheme, plan, or design . . . or (5) the identify of the person

---

58. N.T. 5/10/10, pp. 90-94, 97-99.
59. N.T. 5/10/10, pp. 66-78.
60. N.T. 5/10/10, p. 79.

charged with the commission of the crime on trial. Additionally, evidence of other crimes may be admissible to show the history of the case and to form part of the natural development of the facts. None of these exceptions are applicable to the within case.

For all these reasons, the prejudice of consolidating these cases outweighs any competing interests. As a result, the severance request must be granted. A contrary decision would be a manifest abuse of discretion.

### C. *Motion To Suppress Physical Evidence in Case CR-4799-2009*

The defense challenges the constitutionality of the searches conducted in this case on the basis that (1) the initial searches of the residence were illegally performed without consent or a search warrant, and (2) even if the initial searches were lawful, the "search warrant that was executed . . . for controlled substances"[61] was too broad because no probable cause existed to search the detached garage or the entire property.[62] After the first hearing, the defense submitted a memorandum of law in support of defendant's omnibus pretrial motion, which raised several additional contentions, including that the first search was overly broad and deliberately misleading. The defense argues that the first search warrant was misleading

61. Omnibus pretrial motion in case CR-4799-09, ¶30.

62. This contention raises a challenge to only one of the two search warrants. However, both search warrants identify controlled substances as an item to be searched for and seized. Therefore, it is unclear whether this objection is intended to apply to the first or second search warrant. For this reason, the scope of both of the search warrants will be evaluated.

because it failed to mention that the shooting occurred outside the residence, that the suspect was taken into custody outside the residence, that the weapon used in the crime had already been seized, that the victim was found outside the residence, and that members of the police had been inside the residence and did not observe any blood.[63] Based on these arguments, the defendant seeks to suppress the evidence collected from the searches, as well as any fruit of the poisonous tree.

## 1. Whether the Initial Searches Were Lawful

The defense contends that the entries into the defendant's residence by Officer Williams to secure the firearms, and the subsequent entrance by Ms. Hawkins, Trooper O'Neill, and Trooper Vanim, to secure cellular telephones and video recording equipment, were improper. Based upon the testimony presented, these initial searches by the police were lawful because of the presence of exigent circumstances and the consent of Ms. Hawkins.

"In a private home, 'searches and seizures without a warrant are presumptively unreasonable . . . .'" *Commonwealth v. Roland,* 535 Pa. 595, 599, 637 A.2d 269, 271 (1994), quoting *Arizona v. Hicks,* 480 U.S. 321, 327 (1987). Therefore, "[a]bsent consent or exigent circumstances, private homes may not be . . . entered to conduct a search or to effectuate an arrest without a warrant, even where probable cause exists." *Commonwealth v. Griffin,* 785 A.2d 501, 505 (Pa. Super. 2001). The "exigent cir-

63. Memorandum of law in support of defendant's omnibus pretrial motion ¶¶22-26.

cumstances" exception to the warrant requirement recognizes that some situations present a compelling need to arrest or search under circumstances which otherwise would not be permitted. Justice Castille, in *Commonwealth y. Revere,* 585 Pa. 263, 888 A.2d 694 (2005), referred to "exigent circumstances" as a term of art that describes a situation where "a more orderly process must yield to an urgent necessity for immediate action." *Id.* at 698 n.5. Exigent circumstances "arise where the need for prompt police action is imperative, either because evidence is likely to be destroyed, . . . or because there exists a threat of physical harm to police officers or other innocent individuals." *Commonwealth v. Copeland,* 955 A.2d 396, 400 (Pa. Super. 2008), quoting *Commonwealth v. Stewart,* 740 A.2d 712, 717 (Pa. Super. 1999). However, police may not create their own exigencies only to then use that as justification for departing from the warrant requirement. *Commonwealth v. Melendez,* 544 Pa. 323, 330, 676 A.2d 226, 230 (1996).

The determination of whether exigent circumstances exist must be made in the context of the facts of a particular case and require scrutiny of "the inherent necessities of the situation at the time." *Stewart,* 740 A.2d at 717, quoting *Commonwealth v. Hinkson,* 315 Pa. Super. 23, 461 A.2d 616, 618 (1983) (warrantless search of a home following a shooting justified by exigent circumstances). Some factors to evaluate in deciding the exigency of the situation include the gravity of the offense being investigated or the need to provide immediate aid. *Welsh v. Wisconsin,* 466 U.S. 740 (1984); *Commonwealth v. Miller,* 555 Pa. 354, 364, 724 A.2d 895, 900 (1999). The Pennsylvania Supreme Court has listed a number of

factors that should be considered when determining the exigency of circumstances, including:

"(1) the gravity of the offense; (2) whether there is a reasonable belief that the suspect is armed; (3) whether there is a clear showing of probable cause; (4) whether there is a strong showing that the suspect is within the premises to be searched; (5) whether there is a likelihood that the suspect will escape; (6) whether the entry was peaceable; (7) the time of the entry *i.e.,* day or night; (8) whether the officer was in hot pursuit of a fleeing felon; (9) whether there is a likelihood that evidence may be destroyed; and (10) whether there is a danger to police or others." *Commonwealth v. Walker,* 836 A.2d 978, 981 (Pa. Super. 2003).

Here, after reporting to the scene of a shooting at 4657 East Mill Hill Road, Officer Williams was justified in asking Ms. Hawkins about the location of the gun used in the shooting, and immediately thereafter entering the residence to secure the weapon. Given the seriousness of the offense, these actions were necessary to ensure the safety of others, as well as to preserve the evidence. No hasty retreat was required to await a search warrant. See *Mincey v. Arizona,* 437 U.S. 385, 392-93 (1978).

Officer Williams made a peaceable entry into the residence with Ms. Hawkins, who guided him into the kitchen to find the gun. Officer Williams testified that there were children located inside the residence who could have gained access to the firearm. The firearm had been left in the open on the kitchen counter and contained four live rounds of ammunition and one spent round of ammunition. These facts provided Officer Williams with sufficient exigent circumstances to support his warrant-

less entry into the defendant's residence. See *Commonwealth v. Fickes,* 969 A.2d 1251, 1255 (Pa. Super. 2009) (Exigent circumstances exist where there is a "danger to police or other persons inside . . . the dwelling"). Hence, Officer Williams acted properly in entering the residence and in securing the gun.

It should be noted that after locating the defendant's gun inside the residence, Officer Williams refrained from conducting a detailed search of the residence. He was inside the residence for approximately 60 to 90 seconds, and at no time did he observe any blood or anything illegal. Therefore, the intrusion into the home by Officer Williams was minimal, and does not raise constitutional concerns.

"The Fourth Amendment [also] recognizes a valid warrantless entry and search premises when police obtain the voluntary consent of an occupant who shares, or is reasonably believed to share, authority over the area in common with a co-occupant who later objects to the use of evidence so obtained." *Georgia v. Randolph,* 547 U.S. 103, 106 (2006); see also, *Commonwealth v. Yancoskie,* 915 A.2d 111, 114 (Pa. Super. 2006). In order for consent to be valid, it must be unequivocal, specific, and voluntary. The voluntariness of consent is a question of fact that is determined by looking at the totality of the circumstances. Some factors that may be considered in evaluating the voluntariness of consent are:

"(1) the presence or absence of police excesses; (2) physical contact or police direction of the subject's movements; (3) the demeanor of the police officer; (4) the location of the encounter; (5) the manner of expression used by the officer in addressing the subject; (6) the

content of the interrogatories or statements; (7) whether the subject was told that he or she was free to leave; and (8) the maturity, sophistication and mental or emotional state of the defendant . . . ." *Commonwealth v. LaMonte,* 859 A.2d 495, 500-501 n.4 (Pa. Super. 2004), citing *Commonwealth v. Strickler,* 563 Pa. 47, 72-73, 757 A.2d 884, 897-98 (2000).

"[T]he apparent authority exception turns on whether the facts available to police at the moment would lead a person of reasonable caution to believe the consenting third party had authority over the premises." *Commonwealth v. Strader,* 593 Pa. 421, 427, 931 A.2d 630, 634 (2007). Here, Ms. Hawkins co-owned and shared the residence at 4657 East Mill Hill Road with the defendant, and therefore had the apparent authority to consent to the entry and search by police.

Ms. Hawkins verbally consented to allow Officer Williams to re-enter the home with her for a second time on the day of the shooting. Specifically, when Ms. Hawkins requested to go into the residence to collect belongings for her children, Officer Williams asked whether there were any other guns located in the house. When Ms. Hawkins said yes, there were additional firearms, Officer Williams asked, "Do you mind if come with you" into the residence. Ms. Hawkins stated that she did not mind, and they together went into the home. Upon their entry into the residence, Ms. Hawkins guided Officer Williams into the master bedroom and showed him a gun located under the mattress.

Later, during the evening on September 20, 2009, Ms. Hawkins signed a "waiver of rights and consent to

search" prepared by Trooper O'Neill, to allow the police to enter the residence and to search for and seize cellular telephones and video/audio recording instruments. Trooper O'Neill reviewed the waiver document with Ms. Hawkins, and even instructed her that she did not have to consent. Nonetheless, Ms. Hawkins signed the consent form and then escorted the investigators to the master bedroom, where the audio/video equipment was located.

The totality of the circumstances demonstrates that the police had a reasonable belief that Ms. Hawkins had the authority to consent to the search and that Ms. Hawkins gave her voluntary consent to allow Officer Williams, and later the troopers, to enter her residence. *Id.* at 635. There is no indication that Ms. Hawkins was coerced in any way into consenting to the entry, or that the demeanor and conversations between the police and Ms. Hawkins were anything but cordial. Further, the police remained in the residence during each of these searches for only a very short duration, and the police refrained from conducting a more detailed search of the home until after securing a search warrant.

For all the foregoing reasons, the exigent circumstances justified the initial entry into the residence by Officer Williams, and Ms. Hawkins later provided the police with lawful consent to enter the residence. Accordingly, the motion to suppress the physical evidence collected during the initial searches is denied.

2. Whether the First Search Warrant Was Misleading

It is alleged that the affidavit of probable cause of the first search warrant is deliberately misleading. Specifi-

cally, the defendant contends that the information in the first search warrant contained misleading information in the form of omissions. The affidavit failed to mention that the shooting occurred outside the residence, that the suspect was taken into custody outside the residence, that the weapon used in the crime had already been seized, that the victim was found outside the residence, and that members of the police had been inside the residence and did not observe any blood.[64] The defense argues that this information was critical to allow the magistrate to determine the valid scope of the warrant, and to evaluate whether or not the items sought could be found in the defendant's residence. As a result, the defense contends that the search warrant was defective and the evidence collected should be suppressed.

To determine whether probable cause exists for the issuance of a warrant, a court must examine the totality of the circumstances. *Housman,* 986 A.2d at 843. An issuing authority is not required to find a showing of criminal activity; mere probability of such criminal activity is sufficient for probable cause. *Commonwealth v. Days,* 718 A.2d 797, 800 (Pa. Super. 1998). The information set forth in an affidavit of probable cause "must be viewed in a common sense, nontechnical, ungrudging and positive manner." *Housman,* 986 A.2d at 843, citing *Commonwealth v. Baker,* 532 Pa. 121, 126, 615 A.2d 23, 25 (1992). However, if a search warrant is based on false statements and/or omissions it may be invalid. Where omissions are the basis for a challenge to an affidavit for a search warrant, the courts apply the following test: "(1)

64. Memorandum of law in support of defendant's omnibus pretrial motion, ¶¶22-26.

whether the officer withheld a highly relevant fact within his knowledge, 'where any reasonable person would have known that this was the kind of thing the judge would wish to know'; and (2) whether the affidavit would have provided probable cause if it had contained a disclosure of the omitted information." *Commonwealth v. Taylor,* 850 A.2d 684, 689 (Pa. Super. 2004), adopting reasoning in *United States v. Frost,* 999 F.2d 737, 743 (3d Cir. 1993), *cert. denied* 510 U.S. 1001 (1993). When faced with an omission, "a court removes the falsehood created by an omission by supplying the omitted information to the original affidavit." *United States v. Brown,* 647 F. Supp.2d 503, 514 (W.D. Pa. 2009). In other words, if there is a material omission, it is added to the affidavit. The affidavits are then reviewed again to determine if probable cause is established.

The courts have explained that when it comes to omissions, "assessment of that which has been left out of the affidavit is not . . . easy, particularly in light of the reality that 'all storytelling involves an element of selectivity." *Id.,* citing and quoting *Wilson v. Russo,* 212 F.3d 781, 787 (3d Cir. 2000). "Police officers are not required to relate the entire history of events leading up to a warrant application with 'every potentially evocative detail that would interest a novelist or gossip.'" *Id.* On the other hand, "one of the foundations of a magistrate judge's evaluation of probable cause is the presumption that an uninterested party is better suited to review and evaluate evidentiary facts than the investigating officer . . . ." *Id.*

Following a review of the affidavit of probable cause, and the testimony presented at the hearings, the defense

position is untenable. The allegations focus on omissions relating to the locations of the shooting, the victim, and the arrest of the defendant, as well as the seizure of the gun and the failure of police to observe blood inside the residence. In light of the probable cause standard, these omissions would not preclude the issuance of the search warrant. The first search warrant was obtained early in the investigation, on the same day of the shooting, and there is no evidence that Trooper Durilla was aware of any of the "omitted" facts. Furthermore, this court does not believe that any of the alleged omissions create a false impression. In particular, the fact that the victim was shot six to seven feet outside the entrance of the residence does not render the residence off-limits for the investigation. This is especially true when consideration is given to the presence of eight or nine persons on the property when the shooting occurred, and the fact that at least one person reentered the residence after the shooting to place the gun in the kitchen. Facts of this type easily demonstrate that the residence, which was a few feet away, could have held important trace and other evidence regarding the crime. Additionally, the failure of police to observe any blood in the residence during their initial searches was irrelevant. The officers that entered the residence before the execution of the first search warrant were not looking for blood evidence, and this type of evidence is often undetectable without close examination.

The defendant further contends that the seizure of the gun from the kitchen was an important fact, stating that "had the magistrate been provided with accurate and complete information that the gun allegedly used in the

shooting was seized by Officer Williams, there would be no need to further search the residence for firearms." Again, this argument lacks traction. There were two firearms recovered by Officer Williams from inside the residence before the first search warrant was executed, and both of the guns were secured with the assistance of Ms. Hawkins. There were numerous other firearms collected under the first and second search warrants. One of the firearms collected by Officer Williams was alleged to have been used the shooting, but this fact had not been confirmed by the police.

The final omission raised by the defendant is the failure of the affidavit to indicate that the defendant had been taken into custody outside the residence. Again, this fact was irrelevant to a finding of probable cause. The arrest of the defendant did not impact the type of investigation that needed to be performed, particularly since the affidavit only identified the defendant as the probable shooter. Moreover, there was other information in the search warrant that justified its issuance. The well-known standard of probable cause for the issuance of a search warrant was recently explained as follows:

"Article I, Section 8 and the Fourth Amendment each require that search warrants be supported by probable cause. 'The linchpin that has been developed to determine whether it is appropriate to issue a search warrant is the test of probable cause.' *Commonwealth v. Edmunds,* 526 Pa. 374, 586 A.2d 887, 899 (1991) (quoting *Commonwealth v. Miller,* 513 Pa. 118, 518 A.2d 1187, 1191 (1986)). 'Probable cause exists where the facts and circumstances within the affiant's knowledge and of which he has reasonably trustworthy information are sufficient

in themselves to warrant a man of reasonable caution in the belief that a search should be conducted.' *Commonwealth v. Thomas,* 448 Pa. 42, 292 A.2d 352, 357 (1972).

"In *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), the United States Supreme Court established the 'totality of the circumstances' test for determining whether a request for a search warrant under the Fourth Amendment is supported by probable cause. In *Commonwealth v. Gray,* 509 Pa. 476, 503 A.2d 921 (1986), this court adopted the totality of the circumstances test for purposes of making and reviewing probable cause determinations under Article I, Section 8. In describing this test, we stated:

"Pursuant to the 'totality of the circumstances' test set forth by the United States Supreme Court in *Gates,* the task of an issuing authority is simply to make a practical, commonsense decision whether, given all of the circumstances set forth in the affidavit before him, including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place . . . . It is the duty of a court reviewing an issuing authority's probable cause determination to ensure that the magistrate had a substantial basis for concluding that probable cause existed. In so doing, the reviewing court must accord deference to the issuing authority's probable cause determination, and must view the information offered to establish probable cause in a commonsense, non-technical manner . . . .

"[Further,] a reviewing court [is] not to conduct a de novo review of the issuing authority's probable cause determination, but [is] simply to determine whether or

not there is substantial evidence in the record supporting the decision to issue the warrant." *Commonwealth v. Jones,* 988 A2d 649, 655 (Pa, 2010), quoting *Commonwealth v. Torres,* 564 Pa. 86, 100-101, 764 A.2d 532, 537-38, 540 (2001) (Executing search warrant at residence shared by victim and defendant was justified even though murder victim was located blocks away because police could expect to find evidence related to the crime in the dormitory room). See also, *Commonwealth v. Evans,* 488 Pa. 38, 410 A.2d 1213 (1979).

Here, the information provided to the magisterial district judge showed that the victim had been shot in the face at 4657 East Mill Hill Road. One of the reporting persons, Theresa Hawkins, reported that the defendant shot the victim after a disturbance at the residence. There was every reason to believe that evidence related to the shooting would be discovered inside the residence and probable cause existed for the issuance of the search warrant. The fact that the victim was found in close proximity of the home as opposed to in the home ignores the reality of murder investigations.

For all these reasons, there is no evidence that Trooper Durilla purposely mislead or omitted any "highly relevant fact" from the affidavit. The defendant's contentions lack validity and the defendant's motion to suppress physical evidence cannot succeed on this basis. See *United States v. Yokshan,* 658 F. Supp.2d 654 (E.D. Pa. 2009)("[The] defendant cannot demonstrate that the purported omissions are necessary to a finding of probable cause in light of the plethora of available corroborating evidence. In short, the defendant highlights minor and/or inconsequential discrepancies that are insufficient

to overcome the presumption of validity with respect to the affidavits in support of the warrants").

### 3. Whether the First or Second Search Warrants Were Overbroad

Article 1, Section 8, of the Pennsylvania Constitution, similar to its federal counterpart, sets forth a right to be free against unreasonable searches:

"The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures, and no warrant to search any place or to seize any person or thing shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation subscribed to by the affiant."[65]

Courts have consistently interpreted the phrase "as nearly as may be" to require that a search warrant describe the items that are the subject of the search "as specifically as is reasonably possible." *Commonwealth v. Grossman,* 521 Pa. 290, 296, 555 A.2d 896, 898 (1989). This requirement is more stringent than the Fourth Amendment to the United States Constitution, which only mandates that a warrant "particularly describ[e] the place to be searched, and the persons or things to be seized."[66] "A search warrant cannot be used as a general investigatory tool to uncover evidence of a crime." *Commonwealth v. Rega,* 593 Pa. 659, 684, 933 A.2d 997, 1011 (2007). There must be some connection between the alleged crime, the evidence being sought, and the

65. Pa. Const. Article 1, Section 8.
66. U.S. Const. Amend. IV.

places to be searched and items seized. *United States v. Whitner,* 219 F.3d 289, 298-99 (3d Cir. 2000). As a result, where a warrant contains only a general description of items to be seized, or where there is a discrepancy between the items described and the items seized, it has generally been held that the items seized must be suppressed. *Grossman,* at 297, 555 A.2d at 899-900.

In this case, the defendant challenges that "the search warrant that was executed at the defendant's residence for controlled substances was overly broad in that no probable cause existed to search the detached garage or the entire property. . . ."[67] He further argues that;

"the illegally broad scope of the warrant allowed the police to enter rooms, open drawers, closets, safes and containers that otherwise had nothing to do with a shooting investigation . . . . [T]here is no probable cause anywhere in the affidavit [to the first search warrant] to conclude drugs may be found inside the defendant's home."[68]

Consequently, the defense argues "[t]hat the items seized from inside the . . . residence, detached garage and physical property are the fruit of the defective warrant . . . .", and therefore should be suppressed.[69]

The first search warrant describes the area to be searched as "[t]he residence to include the curtilage at 4657 East Mill Hill Road . . ." and identifies the following items to be searched for and seized:

67. Omnibus pretrial motion for case CR-4799-2009, ¶30.
68. Memorandum of law in support of defendant's omnibus pretrial motion, p. 10.
69. Omnibus pretrial motion for case CR-4799-2009, ¶31.

"Any firearms; Any trace and other evidence associated with the discharge of a firearm; Any controlled substances, drugs, drug paraphernalia and items used to store, package or ingest drugs/controlled substances; Any computers; Any audio, video and digital recording systems and any associated records made from said devices; Any additional trace evidence to include, but not limited to blood, DNA, hair and fibers; Any cell phones belonging to the homeowner's Theresa and Daniel Hawkins. Any ammunition and or containers for ammunition.[70]

The affidavit of probable cause for the first search warrant states, in pertinent part, that (1) on September 20, 2009, a male reported a shooting at 4657 East Mill Hill Road; (2) Ms. Hawkins reported that her husband, the defendant, shot the victim in the face in self-defense; (3) police were dispatched to the scene of the shooting and found the victim, Paul Burrier Jr., was suffering from a gunshot wound to his face; (4) the defendant is the homeowner and is believed to be responsible for the shooting; and (5) an immediate search of the residence was necessary because the victim was expected to die and evidence will be compromised if not collected.

Upon examination of the affidavit of probable cause, it is apparent that there is no information pertaining to controlled substances. Hence, there are no facts to support the search for or seizure of "[a]ny controlled substances, drugs, drug paraphernalia and items used to store, package or ingest drugs/controlled substances." However, the remaining items requested to be searched for and seized under the warrant were closely related to the shooting investigation, and were therefore proper.

_____
70. Commonwealth's exhibit 2.

The scope of the search, which includes the entire residence, and not just the kitchen and master bedroom, was also proper. Although it is evident that the kitchen and master bedroom were a primary focus given the location of the guns and the video equipment, it is also clear that the entire residence was accessible immediately after the shooting to the defendant and the other persons present at the shooting. "A lawful search of fixed premises generally extends to the entire area in which the object of the search may be found and it is not limited by the possibility that separate acts of entry or opening may be required to complete the search." *Commonwealth v. Fleck,* 324 Pa. Super. 227, 234, 471 A.2d 547, 550 (1984). See also, *Commonwealth v. Waltson,* 703 A.2d 518, 521 (Pa. Super. 1997) ("Where there is probable cause to believe criminal activity is afoot in one room in a single unit household, a warrant to search the entire unit is not overbroad."). The items sought under the first search warrant, including firearms, cellular telephones, and ammunition, are the type of belongings that would require police to "enter rooms, open drawers, closets, safes and containers" during their search. It was thus proper to allow a search of the entire residence.

The defendant further argues that the first search warrant lacked probable cause to search the detached garage and other curtilage. However, since there is no evidence that the police actually conducted a search of the garage or the surrounding property until after the execution of the second search warrant, the validity of these searches under the second search warrant will be the next issue addressed.

The second search warrant describes the area to be searched as "the residence, curtilage, vehicles, compart-

ments, safes, strongholds, garages, outbuildings and any other containers therein which could be reasonably construed to contain items described within the attachments," and identifies numerous items to be searched for and seized (see supra pp. 533-36). The affidavit of probable cause sets forth specific observations that were made by Trooper Durilia during his initial visit to the defendant's property for the execution of the first search warrant, which necessitated the request for the second search warrant. More specifically, the affidavit of probable cause for the second search warrant states, in pertinent part, that (1) an odor of marijuana existed approaching the entrance of the residence; (2) the residence had a room with marijuana, fans, a dehumidifier, and a heater; (3) a second room in the residence contained a dry erase board with notes regarding the watering of marijuana plants; (4) a walk-in closet in the master bedroom held 4 safes, ammunition for a .223 caliber rifle, and a large bag of marijuana; (5) a dresser in the master bedroom contained scales, plastic bags, and glass jars with seeds and suspected marijuana; (6) two bags in the living room held marijuana; (7) the odor of marijuana was detectible from the detached garage; (8) light could be seen emanating from the door frame on the garage and fans could be heard in a room attached to the garage; and (9) Trooper Corey Mengel detected the odor of marijuana in a vehicle on the property registered to Ms. Hawkins.

It became evident during the execution of the first search warrant that there were overwhelming indications that a marijuana growing operation was being carried out on the defendant's property. Trooper Durilla's experience as a member of the Pennsylvania State Police and

his training in the area of drug law enforcement,[71] made him particularly equipped to identify marijuana, the odor of marijuana, and the various tools used to grow and harvest marijuana. Given the totality of his experience and his observations, it would be reasonable to believe that controlled substances, and data and objects related to their manufacture, care and sale, would be present at the defendant's property. It is clear that, the second search warrant was sufficient for a reasonable person to conclude that the search for controlled substances and related items was necessary in order to corroborate Trooper Durilla's observations. This information was sufficient to sustain the warrant for the garage and the vehicle.

Regarding the remainder of the property surrounding the residence and the garage, the second search warrant clearly indicated the intention of the police to search the curtilage and outbuildings on the property. The testimony of Trooper Durilla indicated that these areas were searched and that 13 marijuana plants and three containers of marijuana were found and seized from a garden behind the house and from the woods, respectively.[72]

Curtilage, for the purpose of a search or seizure, is defined as "the area to which extends the intimate activity associated with the 'sanctity of a man's home and privacies of life.'" *Commonwealth v. Bender,* 811 A.2d 1016, 1018 n.2 (Pa. Super. 2002), citing *Commonwealth v. Oglialoro,* 525 Pa. 250, 258, 579 A.2d 1288, 1292 (1990). "Whether a given area is within the protected curtilage of one's dwelling depends upon a number of

71. Commonwealth's exhibit 3, ¶¶1 and 2.

72. Commonwealth's exhibit 3, receipt/inventory of seized property, item numbers 88 and 89.

factors, including its *proximity* to the dwelling, whether is within the enclosure surrounding the dwelling, and its use as an adjunct to the domestic economy or the family." *Commonwealth v. Cihylik,* 337 Pa. Super. 221, 486 A.2d 987, 992 (1985), quoting *United States v. Minker,* 312 F.2d 632, 634 (3d Cir. 1962). (emphasis added) Here it is clear that both the garden and the wooded area were within the curtilage of the defendant's home. Both of these areas were located in the proximity of the residence, with the garden located just north of the garage, and the woods located approximately 10 yards from the northwest corner of the house.[73] In light of Trooper Durilla's observations regarding an extensive marijuana operation, a reasonable person would believe that there was a fair probability that contraband or evidence of a crime would be found in these places. The search warrant was not overbroad with respect to the curtilage and outbuildings. Furthermore, the search of the curtilage and any outbuildings was proper, and the evidence collected therefrom is admissible.

In conclusion, while the scope of the first search warrant may have been overbroad in its request to search for and seize drug-related items, since no such items were seized under that warrant, there is nothing to suppress. In all other respects, the scope of the first search warrant was proper. The scope of the second search warrant was proper in its execution and it was not overbroad.

### ORDER

And now, September 16, 2010, following consideration of the defendant's omnibus pretrial motions filed

---

73. Preliminary hearing, 11/19/09, p. 16.

on February 19 and 22, 2010, and after hearings held in the above-captioned cases;

It is hereby ordered that the motions are granted in part and denied in part, as follows:

(1) The motion to suppress statements in case CR-4684-2009 is denied.

(2) The motion to sever case CR-4684-2009 from cases CR-4799 and CR-5242-2009 is hereby granted.

(3) The motion to suppress physical evidence in case CR-4799-2009 is denied.